Vol. 106]        JANUARY TERM, 1899.        7

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

CASE 2—LIQUIDATION OF AFFAIRS OF INSOLVENT CORPOR-ATION—MARCH 8.

# Bell & Coggeshall Co., The, Etc. v. Kentucky Glass Works Co., Etc.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVIVION.

(ON REHEARING.)

1. CORPORATIONS—POWER TO MORTGAGE.—A power to mortgage cor-porate property is necessarily implied in the power to con-tract debts.

2. SAME—MORTGAGE BY EXECUTIVE OFFICER.—A mortgage of cor-porate property by the executive officers to whom the general management of corporate affairs was intrusted by the articles of association and exercised for a long period by general ac-quiescence, can not be held invalid on account of the failure of the corporation to formally authorize it.

3. SAME—INDEBTEDNESS IN EXCESS OF CHARTER LIMIT.—As against other corporate creditors a mortgagee of corporate property will not be permitted to enforce his mortgage for an amount in ex-cess of that named in the articles of association as the limit of corporate indebtedness.

4. WAREHOUSE RECEIPTS —A warehouse receipt issued by a manu-facturing corporation for articles recited to be in its warehouse, and used by it in its ordinary course of business, can not be held to create a valid lien under section 4768 of the Kentucky Statutes.

(On a petition for an extension of the opinion, the court held the following points:)

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

5. APPLICATION OF PAYMENTS MADE BY ASSIGNOR BEFORE ASSIGN-
MENT.—Where a bank held a mortgage of corporate property
valid as to other creditors to the extent the corporation could
legally create a debt and invalid as to the excess, general pay-
ments made by the assignor prior to the assignment will be
credited on the unsecured indebtedness, the entire claim being
valid as to the assignor itself.

6. SAME.—Payments made by the assignee after assignment in such
a case will be credited on the secured debt.

ROBT. J. ELLIOTT IN AN ORIGINAL BRIEF FOR APPELLANTS, AND IN
RESPONSE TO APPELLEE'S PETITION FOR A REHEARING.

1. The mortgage for $48,600 by the Kentucky Glass Works Com-
pany to the Kentucky National Bank, dated November 20, 1885,
but not lodged for record until August 26, 1886, was and is
illegal and void. It was fraudulently executed and delivered
and put to record for a fraudulent purpose and with the fraud-
ulent intent on the part both of the Glass Works Company
and said bank to hinder, delay and defraud those who were then
and those who should thereafter become *bona fide* creditors of
said Glass Works Company; and said bank so fraudulently
asked for, demanded and took and caused said mortgage to
be recorded.

2. Each of the warehouse receipts, numbers 7, 13, 17, mentioned
in the pleadings, was without any valuable and good consider-
ation, illegally and fraudulently issued and fraudulently de-
livered to Ed. Bull by the Kentucky Glass Works Company for
a fraudulent purpose and with fraudulent intent, thereby to
hinder, delay and defraud the creditors in said Glass Works
Company, which facts were then known to the Kentucky
National Bank.

3. The deed of assignment, dated April 27, 1887, purporting to have
been made by the Kentucky Glass Works Company to T. W.
Spindle, as assignee, was fraudulently and without authority
executed and delivered by Ed. Bull as president of said com-
pany, and was fraudulently and without authority so acknowl-
edged and lodged for record by him. And said alleged deed of
assignment was not authorized by law and is invalid. Neither
the execution nor delivery nor acknowledgment of said deed for
record was done or ratified or authorized by the Kentucky Glass
Works Company, and all of said facts were then well known

to the president of said company and said alleged deed of assignment is invalid, null and void.

Citations:   Thomas v. R. R. Co., 101 U. S., 28; Morawetz on Private Corporations, sections 249, 316, 343, 346, 395, 408, 479, 512, 513, 580, 591, 606, 607, 619, 620, 622, 641, 642, 643, 644, 645, 648, 649, 686, 708, 815, 1048, 1054; Green's Brice's Ultra Vires, 81, 2d. Am. Ed.; Gen. Stat., ch. 44, art. 1, sec. 1; Bur-- rell on Assignments, secs. 79, 87, 476, 501, 507; Hieronymous, &c., v. Mayhall, 1 Bush, 510; Foster v. Grigsby, 1 Bush, 97; Lowry v. Fisher, 2 Bush 76; Murphy v. City of Louisville, 9 Bush, 193; Douglass v. Cline, 12 Bush, 608; Bartlett v. Borden, 13 Bush, 47; Griffith v. Cox, 79 Ky., 562; Little v. Ragan, &c., 83 Ky., 325; Haskell v. Wynne, &c., 3 Ky. Law Rep., 54; Ward v. Trotter, 3 Mon., 3; Byrd v. Bradley, 2 B. M., 239; Bank of U. S. v. Huth, 4 B. M., 530; Bowling v. Winslow's Admr., 5 B. M., 31; Trimble v. Ratcliff, 9 B. M., 518; Baker v. Dobbyns, 4 Dana, 225; Vernon v. Morton, 8 Dana, 263; Bucklin v. Thompson, 1 J. J. M., 226; Breckinridge v. Churchill, 3 J. J. M., 13; Maiders v. Culver's Assg., 1 Duv., 166; Lyne v. Bank of Louisville, 5 J. J. M., 554; Dougherty v. Kercheval, 1 A. K. M., 53; McGowen v. Hoy, 5 Litt., 243; Weeden v. Hawes, 10 Conn., 50; German Ins. Bank v. Nunes, 80 Ky., 335; Bank of Commerce v. Payne, 10 Ky. Law Rep., 48; York, Assg., v. Ferrell, 14 Ky. Law Rep., 207; Scott v. Strauss, 14 Ky. Law Rep., 892; National Bank v. Matthews, 98 U. S., 624; De Camp v. Alward, 52 Ind., 469; Perkins v. Pike, 42 Me., 149; Smith v. Moore, 26 Ill., 396; McAllister v. Clopton, Exr., 51 Miss., 261; Hays v. Mercier, 22 Neb., 660; Buell v. Buckingham, 16 Iowa, 290; Ringo v. Biscoe, 13 Ark., 563; Curtis v. Leavitt, 15 N. Y., 9; Hughes v. Elli- son, 5 Mo., 463; Loeb v. Pierpoint, &c., 58 Iowa, 469; Fisher v. Murray, 1 E. D. Smith (N. Y.), 341; Tapley v. Butterfield, 1 Met. (Mass.), 517; Deming v. Colt, 3 Sand. (N. Y.), 463; Anderson v. Tompkins, 1 Brock. (N. Y.), 463; Mt. Sterling & Jeff. Tp. Co. v. Looney, 1 Met., 551.

JOHN C. RUSSELL and GEORGE B. THORNTON for the Kentucky National Bank.

Counsel discussed *seriatim* the points urged for reversal and cited Morawetz on Private Corporations, secs. 600, 680, 689, 695, 696, 711; National Bank v. Matthews, 98 U. S., 624; Silver Lake Bank v. North, 4 Johnson Chan. Reps., 370.

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

JOHN C. RUSSELL AND HUMPHREY & DAVIE FOR APPELLEE, KENTUCKY NATIONAL BANK, IN A PETITION FOR A REHEARING.

1. The opinion delivered is erroneous in holding the deed and mortgage to be void. Ky. Stats., sec. 542; Thompson on Corps., secs. 6133, 6136, 6179, 6184, 6165, 5318; Pools v. West Point Butter Assn., 30 Fed. Rep., 513; McElroy v. Minnesota Percheron Horse Co., 96 Wis., 317; Central Trust Co. v. Columbus Railroad, 87 Fed. Rep., 815; Cook on Stockholders, (4th ed.), sec. 716 and note; Morawetz on Corps. (2d ed.), secs. 689 to 700; same, secs. 673, 678, 680; Sherman Center Town Co. v. Morris, 19 Am. St. Rep., 134; Sherman Center Town Co. v. Swigert, 19 Am. St. Rep., 137; Sherman Natl. Bank v. Butchers' Hide and Tallow Co., 97 Ky., 40; Natl. Bk. of Cynthiana v. Mattingly & Sons, 18 Ky. Law Rep., 425; Trapp v. Fidelity Natl. Bk., 19 Ky. Law Rep., 1114.

2. The opinion is erroneous in holding that because the indebtedness which the mortgage secures is in excess of $8,000, limit of the Glass Works' charter, therefore the mortgage to secure it is void in *toto*, even for the $8,000. Garrett v. Burlington, 59 Am. St. Rep., 461; Warfield v. Marshall, 2 Am. St. Rep., 263; Thompson on Corps., sec. 5705; Ossipe Hosiery Co. v. Canney, 54 N. H., 55; Wood v. Corey Water Works, 44 Fed. Rep., 146; Allis v. Jones, 45 Fed. Rep., 148; Shermantown Co. v. Morris, 19 Am. St. Rep., 134; Humphrey v. Patrons' Assn., 50 Ia., 607; Jones on Mortgages, sec. 127; Sioux City Terminal v. Trust Co., 82 Fed. Rep., 133; Cook on Stockholders (4th ed.), sec. 760; Hervey v. Illinois R. T., 28 Fed. Rep., 169; Barret v. Pollock, 108 Ala., 390; Alabama Co. v. McKeever, 112 Ala., 134; Antitam Paper Co. v. Chronicle Co., 115 N. C., 143; Bebe v. Richmond Light Co., 3 N. Y. App. Div., 334; Hamilton Co. v. Clemes, 17 N. Y. App. Div., 152; Cook on Stockholders (4th ed.), sec. 708.

3. The opinion is wrong in holding the warehouse receipts to be void. Ky. Stats., sec. 4768; Black's Law. Dict., title "Warehousemen;" Greenbaum v. Megibben, 10 Bush, 419; Cochran & Fulton v. Ripy, 13 Bush, 495; Ray v. Com., 12 Bush, 397; Colebrooke on Collateral Securities, sec. 420; Merchants' Bank v. Hibbard, 48 Mich., 118; Ferguson v. Northern Bank, 14 Bush, 561; Greenbaum v. Burns, 15 Ky. Law Rep., 710; Block v. Oliver, 19 Ky. Law Rep., 1278; Northrop v. First Natl. Bk. of Chicago, 27 Ill. App., 527; Ky. Stats., secs. 4771, 4772, 4773, 4774, 4775.

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

ROBT. J. ELLIOTT FOR APPELLANTS IN A PETITION FOR AN EXTENSION
OF THE OPINION.

(On December 15, 1898, the Court of Appeals in an opinion
by Judge Guffy reversed the judgment of the court below. Judge
Paynter dissenting.

On March 8, 1899, the former opinion of the court was with-
drawn and the following opinion by Judge DuRelle delivered,
Judge Guffy dissenting from so much of the opinion as holds
the mortgage valid for any purpose. Judge Paynter also dis-
senting.)

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT. '

The questions presented by this appeal grow out of a
contest between the creditors of the Kentucky Glass
Works Company, an insolvent corporation. The com-
pany was incorporated in 1879 under the general corpora-
tion act; it being provided in the articles of incorporation
that the general business of the corporation proposed to
be transacted is the manufacture of glass in all its forms,
and for all the purposes for which it is manufactured. The
capital stock was fixed at $12,000.

By the fourth paragraph it was provided: "The busi-
ness and affairs of the corporation shall be conducted by
the following officers, viz.: A president, a secretary, and
a general superintendent; and said officers shall be stock-
holders, and elected on the last Monday in July of each
year, except in the year 1879. The said corporators shall
fill said offices until the last Monday in July, 1880, and
until their successors are elected regularly under these
articles. The office of president, until the first regular
election, shall be filled by said Edward Bull; that of
secretary, by William Cromey; and that of superintendent,
by John Stanger, Sr." By the fifth paragraph it was pro-
vided: "The highest amount of indebtedness or liability

**12**      KENTUCKY REPORTS.      [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

to which said corporation shall at any one time subject itself shall be $8,000." The company thereupon engaged in the business of glass-making, and continued it until April 27, 1887, when a deed of assignment was filed for the benefit of its creditors. In September, 1888, the assignee filed his petition for a settlement. There had been a good deal of litigation between the creditors of the corporation, the material evidence in which was considered as evidence in this action. The appellants were authorized to represent, not only their own claims, but the claims of others of like character. The Kentucky National Bank claims under a mortgage for $48,600 and interest.

This mortgage was dated December 20, 1885, and was recited to be from the Kentucky Glass Works Company, and Ed Bull and Robert F. Bull as stockholders in said company, to the Kentucky National Bank, to secure a previous indebtedness of $48,600, represented by various notes bearing date at various intervals during the year 1885, and to convey by way of mortgage the land of the Kentucky Glass Works Company, the machinery and plant, goods and wares, and materials for manufacture, with the right, however, in the company to retain possession of and work up the materials, and continue the manufacture of glassware; the proceeds of sales to be applied to the payment of the indebtedness secured by the mortgage. The instrument concludes: "In testimony whereof said parties of the first part have set their hands and seal hereto; and said Kentucky Glass Works Company, by its president, has hereto set its name and affixed its corporate seal, and caused this instrument to be attested by its secretary, the day and year herein first above written. Kentucky Glass

Works Company. [Seal.] E. Bull. E. Bull, Pres. Attest: Wm. Cromey, Secretary. R. F. Bull. R. F. Bull, Vice-President."

The first question for decision is whether the mortgage is void for the reason that it was executed without authority from the board of directors.

It will be observed that the articles of incorporation do not provide for any board of directors but commit the entire management of the business of the company to three executive officers. It appears that the company never had a meeting, never adopted any by-laws, and never had an election, but that the president and secretary named in the articles continued to act as president and secretary until after the execution of the mortgage—R. F. Bull being nominally vice-president—and that it had no general superintendent. The stock of the company was owned entirely by Edward Bull and Robert F. Bull, except ten shares belonging to John Bull's estate,.of which William Cromey, the secretary, was the trustee up to May following the date of the mortgage, when he ceased to be trustee, or to act as secretary. The person named in the articles of incorporation as general superintendent appears never to have taken stock, or acted in that capacity. The business was managed by the president, who made the contracts, superintended the business, borrowed money, drew checks for it, and attended to all matters of business. The mortgage appears to have been executed because the bank was about to cease extending credit to the company.

Under these circumstances, and with these articles of incorporation before us, can it be justly said that the mortgage was invalid because its execution was not authorized by a board of directors?

There are numerous authorities to the effect that where a corporation loosely commits all its business affairs to a superintendent or president, and acquiesces in such management for a great length of time, the acts of the corporation through such officers will be held valid to the extent of giving preference after insolvency. Thompson on Corporations, sec. 6179, referring to Poole v. West Point Butter Association, 30 Fed. Rep., 513 (opinion by Mr. Justice Brewer).

In McElroy v. Minnesota Percheron Horse Co., 96 Wis., 317 [71 N. W., 652], it was said: "A corporation may so conduct its affairs as to confer by implication upon its president powers much beyond those strictly incident to his office, even to the extent of exercising the entire powers of the corporation, which by the articles are vested solely in the board of directors." In that case it appeared that "the corporation affairs for about five years had been conducted by the president and by his predecessor in office, without any objections or protests whatever by the stockholders or directors, so far as appears from the records. No election of directors by stockholders was had during that time, and no meeting whatever held, except one a few months before the making of the contract, at which the only business transacted was to fill the places of several directors who had resigned, which was done by those who remained."

In Sherman v. Fitch, 98 Mass., 59, a mortgage not authorized by a vote of the board was held to be valid as against the assignee, the court there saying: "Such an act by the president and general manager of the business of the corporation, with the knowledge and concurrence of the directors, or with their subsequent and long-continued acquiescence, may properly be regarded as the act of the corporation."

See, also Eureka Iron Works v. Bresnahan (Mich.) [27 N. W., 524]; Gordon v. Preston, 26 Am. Dec., 75; Thompson on Corporations, secs. 6165, 5318.

In the case at bar the entire management of the business of the corporation was intrusted by the articles to the company's executive officers. It can not justly be said that it was necessary that they should have a formal meeting to authorize the action to be taken by them, for executive officers do not act by resolution. The board of directors in a properly managed corporation is a deliberative body. It acts by resolution, and directs what the executive of the corporation shall do. But when the executive is to take action, and acts within the scope of his authority, his acts are binding.

The corporation was undoubtedly authorized to mortgage its property, that power being necessarily implied in the power to contract debts. Thompson on Corporations, sec. 6133. That was a part of the business of the corporation, and the executive officers are authorized to transact it.

We conclude, therefore, that the mortgage was not invalid by reason of its execution by the president, secretary and all the stockholders except one, and with the knowledge and concurrence of the trustee of that one.

And this brings us to consider the next question—to what extent, if any, the mortgage was invalid because of its execution for an amount in excess of the liability which the articles of incorporation permit to be incurred.

Were this question between the corporation and the bank, there would be little difficulty. In this case it appears that the money was actually received by the company, and used in its business, and the company would be estopped from refusing to make resti-

**16** KENTUCKY REPORTS. [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

tution of that whereof it had received the benefit. The doctrine is thus stated in Thompson on Corporations, sec 5705: "By the *American law*, where there is a statute imposing a limit upon corporations in respect of the amount of debts which they can incur, a creditor who does not know that the limit has been exceeded, and who has no reasonable ground to believe that such is the fact, may enforce the obligation of the contract against the corporation. The true ground upon which this doctrine is based has been already adverted to. It is that, although parties dealing with corporations will be conclusively bound to know the extent of the powers which the statute law has accorded to them, yet where their power to act in a given case depends upon their previous action, which, from its very nature is known only to them, and not to the public dealing with them— in other words where the question is whether their power has been exhausted, and this depends upon a knowledge of antecedent *extrinsic facts*, which knowledge is in the breasts of the corporate officers, and not accessible to the public—then there is an *implied warranty* on the part of the corporation, through its officers, that the power has not been exhausted, and that the conditions do not exist which render it unlawful for the corporation to contract the debt; so that to allow the corporation to avoid the repayment of the debt on this ground, where it has had and enjoyed the benefit of the contract, would be to allow it to make its own wrong the means of defrauding the innocent public. It is immaterial on what ground the courts which hold that the corporation can not be permitted to repudiate an honest debt upon such a plea place themselves, whether they say that the statute is *directory* merely, or that the corporation is *estopped* from setting up the defense after having *enjoyed the benefit* of the contract—especially where the money borrowed has been used in con-

ducting the legitimate corporate business, with the knowl-
edge and consent of all its officers and stockholders.. The
judges are in all cases driven to the conclusion by the mere
stress of justice."

It would seem, also, from the same section, that
even in some cases of municipal obligations the
excessive indebtedness may be recovered in a common-law
action, as for money had and received.

But as between other creditors and the creditor
whose own debt was in excess of the limitation
there arises a different question. A creditor whose
own debt against the corporation does not trans-
gress the limitation—who does not know, and has
no reason to know, that the limitation had been exceeded,
has a right to rely upon the "implied warranty on the part
of the corporation, through its officers, that the power has
not been exhausted, and that the conditions do not exist
which render it unlawful for the corporation to contract
the debt." And this reason, it seems to us, applies equally
as against the creditor who participated in creating the ex-
cessive indebtedness, and was bound to know that it was
so doing. The bank was charged with knowledge of the
indebtedness limit in the articles of incorporation of the
company. In the face of that knowledge, it joined with
the company in the creation of an indebtedness against it
far in excess of what the company was authorized to incur.
The bank knew that the indebtedness was being exceeded;
the other creditors did not; and this puts them, in our
judgment, upon an entirely different footing.

An immense number of citations have been made by
counsel. Most of them are cases between the corporation
and the creditor, or between the shareholders and the
creditor, in which the corporation or shareholders sought

[2]

to evade the payment of the excessive indebtedness on the ground that it was *ultra vires*.

We are well aware, however, that there is quite a respectable number of cases, in which it has not only been held that the excessive indebtedness is enforceable against the mortgagor, but that subsequent creditors stand in no better light than the mortgagor himself. Among them are Central Trust Co. of New York v. Columbus, H. V. & T. Ry. Co., 87 Fed. Rep., 815; Allis v. Jones, 45 Fed. Rep., 148; Sioux City Terminal R. Co. v. Trust Co. of North America, 27 C. C. A. 73, 82 Fed. Rep., 133. Those cases proceed upon the assumption that, in the case of a violation of the statute or charter, as the Legislature imposed no penalties, the court could not do so. "The remedy for the violation of this statute," said the court in the case in 82 Federal Reporter, "is not the destruction of the contracts which evidenced it, but the ouster and dissolution of the corporation, at the suit of the State. The State alone can complain of it and the debtor can not usurp its functions." So, in the case in 87 Federal Reporter, the court, through Judge Lurton, said: "For such a violation of the limits imposed by law upon the power of the coal and railroad company to create indebtedness, the State alone should be heard to complain."

In this Commonwealth such a doctrine would render the inhibition of the statute an absolute dead letter. Of what avail would it be to obtain a judgment of ouster and dissolution of the corporation at the suit of the State, when it could be reincorporated in half an hour's time? What attention would be paid to this inhibition in the statute by persons contracting with corporations, if the only penalty for a violation of the statute were a possible

dissolution of the corporation?   Moreover, it is hard to discover what ground the Attorney General would have for hoping to succeed in a suit for ouster and dissolution of a corporation for the offense of making a valid contract.

But it is sufficient to say that this is not the doctrine in Kentucky.   In this State it has been adjudged that such a contract, made in violation of law, while enforceable as between the parties, is not enforceable by either participant as against the rights of third persons.

In the case of First National Bank of Covington v. The D. Kiefer Milling Co., 95 Ky., 97 [23 S. W., 675], the indebtedness of the milling company to the First National Bank was far in excess of that allowed by the company's charter. It was held that "a person dealing with a corporation must, at his peril, take notice of the charter or articles of incorporation."   Said the court, referring to this excess of indebtedness forbidden by the charter:  "Whether, if this was simply a contest between the bank and the milling company, violation and disregard by the latter of the provision of the articles of incorporation would be a sufficient defense, we need not determine; but the enforcement of that provision is demanded by the assignee for the benefit of other creditors, who have been prejudiced by the unauthorized and illegal dealing of the bank with an unfaithful officer of the milling company, whereby its insolvency was precipitated, if not actually caused, and in such a case a participant in the fraudulent transaction, not other innocent creditors, should suffer."

While the fraudulent action of an officer of the company, whose embezzlement had rendered the company insolvent, was mentioned in connection with the matter under discussion, the point at issue was not, as counsel seems to suppose, whether the indebtedness of the bank was ren-

dered invalid by reason of the fraud of the officer, but, as a glance at the beginning of the paragraph quoted and as the previous paragraph will show, the "unauthorized and illegal dealing" referred to was unauthorized and illegal because in violation of the company's charter. That was the ground upon which the cause was decided, and that is the law of this State.

We do not for a moment controvert the proposition so vigorously and so frequently insisted on by counsel, that in equity neither party to an *ultra vires* transaction will be heard to allege its invalidity while retaining its fruits. What we hold is that neither of the participants in a contract forbidden by law is in as good a position as a third person not so participating.

Nor is it any answer to this proposition to say that the other creditors "had full notice of record of the existence of the bank's debt and of the bank's mortgage, and, if they and the bank are to be held to have constructive notice of the limitation to $8,000 of debt in the glass works charter, then appellants also knew that the company had no power to create any other debts at the time they created theirs." There is no similarity between the knowledge of charter limitations, with which a person dealing with a corporation is charged, and the constructive notice given by virtue of the registration laws. They are based upon entirely different theories. A corporation exercises a delegated power. Its very existence is an emanation of sovereignty. Independent of the fact that its articles are accessible in the county clerk's office or in the office of the Secretary of State, every one dealing with it is bound, at his peril, to know the limitations of its powers, just as a person dealing with an agent must, at his peril, ascertain the ex-

tent of the agent's authority. On the other hand, the theory of the registration act is not to give notice of the existence of indebtedness against a person whose mortgage has been recorded. The record is not intended to give actual notice of anything. If a person dealing with a mortgagor has *actual* notice of an unrecorded mortgage, he is bound by that knowledge, and as to him there is not the slightest necessity for recording it. So, a person trading with a corporation whose mortgage to another has been recorded is not in any wise chargeable with notice of the mortgage, and still less, if possible, with notice of the amount of debt thereby secured. If he should take a second mortgage upon the incumbered property, he would be chargeable, not with *actual* notice of either the mortgage or the debt secured by it, but would be chargeable with *constructive* notice of the fact that *that particular property* had been incumbered; and this constructive notice would operate to the extent—and no further—of giving the previously recorded mortgage priority over his. The record of a mortgage gives no *actual* notice of anything whatever. In dealing with a corporation, as with a natural person, the party has a right to ignore the record and take his chances in the trade. As matter of course, if he does so the constructive notice of the record will give to the recorded mortgage priority over his debt as to the incumbered property. But the record was not intended to give actual notice of either the existence of the mortgage, or the amount of the debt secured by it, but only to give a constructive notice of the fact that the property was incumbered, which constructive notice would give priority to that mortgage over all persons acquiring subsequent liens upon that property. If it were shown that these appellants had examined the record, and had actual knowledge

of the terms of the instrument, they would be chargeable with actual knowledge of whatever it showed, just as they would if it had been shown them on the street.

The mortgage was legal, and should be upheld. To the extent the claim secured by it was legal, it should be upheld. As to the amount in excess of the legal indebtedness, the creditor is entitled, not to enforce its contract, but, as between it and the company, to restitution in an action for the money had and received.

It appears that the company desired to buy a Cohansey bottle-grinding machine; and, not having money enough, it procured an advance of $625 for that purpose from the Kentucky National Bank, and, to secure it, gave the bank what is, in form, a warehouse receipt, reciting that it had been received "in our mill-house." It needed soda-ash for use in its business, obtained from the bank an advance of $650, to pay for twenty-nine barrels of ash, and issued another warehouse receipt, reciting that the soda-ash was "received in our mixing-house, at corner Fourth and C streets." And to secure an advance of $850 it gave the bank another warehouse receipt on two hundred gross quart, standard fruit-jars, recited to have been "received in our warehouse No. 1, at corner Fourth and C streets." The validity of these receipts is called in question.

While the argument of counsel for appellees upon this subject is exceedingly plausible, and the statute (Kentucky Statute, section 4768), as well as some authorities cited, lends seeming force to it, it can not be that the statute was intended by the Legislature to receive a construction such as that contended for. Such a construction would utterly abrogate the registration laws as to personalty, and would enable a man to pledge the piano in his parlor, or the furniture in his room, by a secret pocket lien, not required to be registered.

The machine here pledged was intended to be used in the business, was deposited in the mill-house, and doubtless used. The soda-ash was bought for use in the business, and placed in the mixing-house. The jars were part of the stock of the concern. We are unable to see that, in any just sense, they were received in store, within the meaning of the statute.

It results, therefore, that the rehearing is granted, and that the judgment must be reversed and the cause remanded, with directions to adjudge to the Kentucky National Bank a prior lien upon the property to the extent of $8,000, and no more, to adjudge the warehouse receipts to be null and void, and to adjudge the appellants entitled to a *pro rata* distribution of the remaining assets, and for further proceedings consistent herewith.

The whole court sitting.

JUDGE PAYNTER DISSENTS.

JUDGE GUFFY DISSENTS FROM SO MUCH OF THE OPINION AS HOLDS THE MORTGAGE VALID FOR ANY PURPOSE.

JUDGE DuRELLE DELIVERED THE FOLLOWING RESPONSE TO PETITION FOR EXTENSION OF THE OPINION.

The petition for extension of the opinion presents certain questions, the decision of which is rendered necessary by the last opinion.

The question of the validity of the assignment was litigated between the assignee and one of the parties appellant, decided in the affirmative, and the decision affirmed on appeal. We are of opinion, under all the circumstances of this case, that the assignment was valid.

It is urged that, the assignee having made payments to the Kentucky National Bank since the estate came into his hands, those payments should be applied to the

**24** KENTUCKY REPORTS. [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

reduction of the indebtedness to secure which we have held that the bank had a valid mortgage; and this contention, we are satisfied, is correct. Those payments were made by the assignee after the estate came into his hands for the purpose of being administered and distributed to the creditors of the assignor, with due regard to their priorities. It is not to be presumed, therefore, that the assignee made any payment upon any claim to any creditor, except in the order in which such claim was entitled to payment out of the fund in his hands as assignee. Payments otherwise made, unless the estate proved sufficient to pay all claims of higher grade, would have been illegal, and the assignee would not have been entitled to credit therefor. But being presumed to have been made on the claim with respect to which the bank was entitled to priority, those payments must be applied to the reduction of that claim, viz., the $8,000 held to be secured by the mortgage; and the assignee is therefore entitled to credit for those payments in the settlement of his accounts.

An entirely different question is presented as to the payments made to the bank by the glass works company prior to the assignment. In the opinion we have held that as between the parties to the transaction, viz., the bank and the glass works company, the bank had a cause of action for the entire amount advanced by it. There were therefore two claims of the bank to which the payments might have been applied. Clearly, neither party to the transaction made any specific application of the payments; for it is evident that neither of the immediate parties regarded the bank's claim as other than a single claim, all of which was of the same dignity.

The court, therefore, will apply the undirected payments, following the rule in this State, which is that, where

neither debtor nor creditor applies the payment, equity will apply it to the debt which is unsecured, in preference to applying it to the one which is secured. Burks *et ux.* v. Albert, 4 J. J. Marsh., 97, and 20 Am. Dec., 209. To the extent indicated, the opinion is extended.

DISSENTING OPINION BY JUDGE PAYNTER.

The glass works company discounted at various times notes at the Kentucky National Bank, in the aggregate amounting to about $48,000. On November 20, 1885, it, having failed to pay its notes at maturity, executed a mortgage to the bank on certain real esate to secure the total of the indebtedness to the bank. Desiring to buy a Cohansey bottle grinder, and not having money to pay the full amount of the purchase price, it procured at the Kentucky National Bank an advance of $625 for that purpose, and to secure which it gave the bank what the parties called a "warehouse receipt" on the machine. This was in 1887. Needing soda ash for use in the manufacture of glass, the Kentucky National Bank advanced to it $650 to pay for twenty-nine barrels of ash, and upon which was issued another warehouse receipt. The Kentucky National Bank, also, in 1887, advanced the glass works company $850, to secure which the company gave the bank a warehouse receipt on two hundred gross of quart jars. In ——, 1887, the glass works company was indebted to Bridgeford & Co. Bridgeford & Co. brought suit upon their claim, and obtained an attachment against the property of the glass works company. Thereupon, under the advice of counsel, the glass works company made an assignment for the benefit of creditors. In the Bridgeford & Co. action, upon the hearing, the court discharged the attachment. In the meantime the assignee brought suit to settle the trust es-

26 KENTUCKY REPORTS. [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

tate, and appellants, creditors of the glass company, filed their answers, in which certain defenses are interposed.

It is contended that the assignment was made to defraud creditors; that the glass company is a corporation organized under the General Statutes of Kentucky, with a capital stock of $12,000, with a provision in its articles of incorporation that the indebtedness to which the corporation was authorized to subject itself should not exceed $8,000; and that the debts of the bank, which exceeded $8,000, were not enforceable, because of the provision mentioned.

There is nothing in the statute which declares that, if the corporation incurs or creates an indebtedness in excess of that which is authorized, the contract is void. Neither is there anything in the articles of incorporation which so declares. The money was received by the corporation, and used in its business. Some of the assets which were assigned were acquired by the money which it obtained from the bank. There is no evidence that the bank knew that the authority of the glass works company was limited in the matter of contracting an indebtedness.

The record shows that the bank advanced money to the company in the utmost good faith. When a corporation enters into a contract in violation of its charter, either party is allowed to withdraw from it, so long as a rescission can be effected without injustice. When one party has performed the contract, public policy can be best conserved by compelling the other party to make compensation for a failure to perform the obligations imposed by the contract. When money has been borrowed, as in this case, common honesty demands that the borrower be adjudged to pay it. The corporation received the money borrowed; hence, the stockholders necessarily enjoyed the benefit of it. The corporation having received and retained the money, nei-

ther it nor its creditors can be heard to question its au-
thority to borrow the money. It may be said here that
the glass works company, or its shareholders, do not deny
its  liability to  the  bank  for  the  sums  borrowed.
The complaint is from its creditors, most if not all of
whose debts were contracted after the mortgage had been
executed to the bank. If a debtor can not plead that the
debt was contracted in violation of a law, and thus defeat
its enforcement, the creditors of the debtor can not do so.
If the debts due the bank are valid, then it follows that
the mortgage executed to secure it should be enforced.   To
allow a corporation to borrow money and use it for its
benefit, and to defeat an action to recover it on the ground
that it exceeded its authority in borrowing it, is placing a
premium upon dishonesty.   Public policy will not justify
such an injustice.   Morawetz on Private Corporations (sec.
680 says, "That a provision in a charter prohibiting it from
creating an indebtedness in excess of a certain amount does
not render debts incurred in excess of that amount null
and void, by force of the legislative act, unless this be the
plain meaning of the provision."

The same authority says in section 685:  "It seems but
reasonable that a contract which is forbidden by law, and
which may subject the company making it to the penalty
of dissolution, should not be held obligatory, except for
strong reasons of equity.   Either party should be allowed
to withdraw, so long as a rescission can be effected without
injustice.   Accordingly it has been held that a contract
entered into by a corporation in excess of its charter may
be avoided by either party so long as it remains unexecuted
by both parties."

It is said in section 688:  "A court of equity will even
decree the specific performance of a contract entered into

**28** KENTUCKY REPORTS. [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

by a corporation in violation of its charter, if relief of that character is required in order to protect the rights of a party who dealt with the company in good faith and without notice."

In section 689 of the same authority the following language is used: "If a contract is made by a corporation in excess of its chartered powers, either party to the contract may withdraw, so long as a rescission can be effected without injustice; but after a contract of this character has been performed by either of the parties, the requirements of public policy can best be satisfied by compelling the other party to make compensation for a failure to perform the agreement on his side."

In section 695 this doctrine is announced: That, when money is borrowed or loaned by the corporation in violation of an express prohibition in its charter, the contract may be enforced.

Sedgwick on Construction of Statutory and Constitutional Law (p. 73), says: "Where it is simply a question of regularity of organization, or of power conferred by the charter, a party who has had the benefit of the agreement can not be permitted, in an action founded on it, to question its validity. It would be in the highest degree inequitable and unjust to permit the defendant to repudiate a contract, the fruits of which he retains."

In Auerbach v. Mill Co., 28 Minn., 291 [41 Am. Rep., 285, 9 N. W., 801], it was held "that when an unauthorized contract has been executed by a corporation, and it has reaped the benefit of it, public policy does not require the courts to refuse to administer justice between the parties in accordance with the plain principles of law. In such a case the remedy for the violation by the corporation of its charter power lies elsewhere."

We are here seeking to administer justice as between these contracting parties. If justice did not demand the application of other principles of law, the defense of *ultra vires* might be sufficient, but the doctrine of estoppel, as a principle of law, is as positive and well-recognized as is the law that a corporation may not exceed its corporate power; and, although the defendant exceeded its authority, it should be denied the right to assert the fact of its own wrong, when to allow its plea would work injustice and wrong to a party who has been misled by its acts performed within the general scope of its power.

In Manufacturing Co. v. Canney, 54 N. H., 295, it was said: "In this case the statute under which the corporation was organized, forbidding the corporation to contract debts or incur liabilities to exceed one-half of its capital stock actually paid in and unimpaired, and of its other property and assets, is directory. Debts contracted and liabilities incurred in excess of that amount are binding upon the corporation." Garrett v. Plow Co., 70 Iowa, 697 [59 Am. Rep., 461, 29 N. W., 395], held that the debt of a corporation beyond the limit prescribed by its charter is not invalid, but enforceable.

In Steamboat Co. v. McCutcheon, 13 Pa. St., 13, a corporation had taken a lease of real estate without authority in its charter, and in an action for rent the court enforced the contract. The judge, in delivering his opinion, said: "Some things lie too deep in the common sense and common honesty of mankind to require either argument or authority to support them; and this, I think, is one of them."

The court, in the case of Navigation Co. v. Wood, 17 Barb., 382, said: "When it is a simple question of capacity or authority to contract, arising either on a question of regularity or organization, or of powers conferred

by the charter, the party who has had the benefits of the contract can not be permitted to question its validity in an action upon it."

In Whitney Arms Co. v. Barlow, 63 N. Y., 62 [20 Am. Rep., 504], it was said: "The plea of *ultra vires* should not, as a general rule, prevail, whether interposed for or against a corporation, where it would not advance justice, but, on the contrary, would accomplish a legal wrong." In Sherman Center Town Co. v. Morris [19 Am. St. R., 134; 23 Pac., 569], the charter of a corporation provided, "The indebtedness of the company shall not exceed $500 at any one time," and the suit was for an amount nearly four times in excess of the charter limit. The company received and used the merchandise, but undertook to plead *ultra vires* against the payment of the excessive note, and also claimed that the president and secretary were unauthorized by the board of directors. The court said: "After a corporation has enjoyed the benefit of a contract or other arrangement made in good faith with any of its regular agents, it is but fair that every reasonable presumption should be made in order to hold the transaction binding upon the company. Under these circumstances the acquiescence of the shareholders may often be presumed. . . . While an executory contract made by a corporation without authority can not be enforced, yet, where the contract has been executed, and the corporation has received the benefit of it, the law interposes an estoppel, and will not permit the validity of the contract to be questioned. . . . Where a contract results to the benefit of a corporation, very slight evidence of acquiescence or application will be sufficient to give it validity. . . . We think that the limitation of $500 in the charter of the corporation can not be regarded of any

more force than·a by-law. . . . Therefore the limitation of five hundred dollars is for the direction of the officers and agents of the corporation, and may be considered directory only. It does not annul the contract."

In Thompson on Corporations, sec. 5705, it is said: "There is an implied warranty upon the part of the corporation, through its officers, that the power has not been exhausted, and that the conditions do not exist which render it unlawful for the corporation to contract the debt; so that, to allow the corporation to avoid the repayment of the debt on this ground, where it has had and enjoyed the benefit of the contract, would be to allow it to make its own wrong the means of defrauding the innocent public. It is immaterial on what ground the courts which hold the corporation can not be permitted to repudiate an honest debt upon such a plea place themselves—whether they say that the statute is directory merely or that the corporation is estopped from setting up the defense after having enjoyed the benefit of the contract—especially where the money borrowed has been used in conducting the legitimate corporate business, with the knowledge and consent of all its officers and stockholders. The judges are in all cases driven to the conclusion by the mere stress of justice."

In Jones on Mortgages, sec. 127, it is said: "But even if the directors exceed their authority in borrowing money for the corporation, and executing a mortgage to secure the repayment of it, the corporation can not, after enjoying the benefit of the loan and acquiescing in the transaction, question their authority. The stockholders may restrain the directors or other officers in any attempt to transcend their powers; but if they remain silent, and permit them to make contracts or execute mortgages upon their prop-

32            KENTUCKY  REPORTS.        [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

erty, 'and receive the benefits of the loan, they will be es-
topped to say that the officers were not authorized to do
these acts."

In Allis v. Jones, *et al.*, 45 Fed. Rep., 148, the court said:
"The money was received by the companies, and used in
conducting and carrying on their legitimate corporate busi-
ness, with the knowledge and consent of all the officers and
stockholders.   On these facts the banks are entitled to be
repaid their money, and the companies could execute a
valid security for its payment. . . .  Skeen can not be
heard to urge this objection, because he is not a creditor of
the milling companies; and Allis became such, if at all,
after the debts to the banks had been created, and it
would seem, therefore, that he is in no plight to raise the
question.   The written promise of the milling companies,
executed by their secretary and treasurer, to pay the
plaintiff's debt, under all the circumstances of this case,
made it the debt of the companies.   But an application
to the plaintiff's case of the strict rules which he seeks
to have applied to the bank's claim and mortgages would
undoubtedly undermine his own case, and leave him with-
out any claim against the companies."

In Sioux City Terminal Railroad & Warehouse Co. v.
Trust Co. of North America [27 C. C. A., 82], 82 Fed. Rep.,
133, the court said "Can the mortgagor, under these circum-
stances, avail itself of its violation of the statute to defeat
the mortgage upon which it has borrowed this money?
If not, have its subsequent creditors any better standing
to assail it?   These are the crucial questions in this case.
This is a suit in equity.   The terminal company has re-
ceived the full benefit of the proceeds of these bonds, and
it obtained this money upon the faith of this mortgage.
The creation of the debt and mortgage was not without

the general scope of its powers, but it was the result of the excessive exercise of one of those powers. . . . The statute, whose provisions the bonds and mortgage violate, prescribed no penalty for such a violation. It did not declare that bonds and mortgages issued to secure an indebtedness in excess of the limitation it fixed should be void. Since the Legislature imposed no such penalty, it is not the province of the, courts to do so. The remedy for the violation of this statute is not the destruction of the contracts which evidence it, but the ouster and dissolution of the corporation at the suit of the State. The State alone can complain of it, and the debtor can not usurp its functions. . . . A man can not plead his own wrong to relieve himself from the obligations of an executed contract whose benefits he retains; nor is it any defense for a private corporation, against the enforcement of an executed contract whose benefits it holds, that, while its execution was within the general scope of its powers, it involved an excessive exercise of one of them. While it retains the benefits of such contract, it silently affirms, and may not be permitted to deny, its validity. . . . These decisions do not rest upon the principle of estoppel, nor depend upon the creditor's ignorance of the excessive indebtedness. They stand upon the rule that he who seeks equity must do equity, and upon the principle that one may not at the same time accept the benefits and repudiate the burdens of his contracts."

In Haldeman v. Ainslie, 82 Ky., 399, the corporation was limited by its articles to incur a liability of $15,000. It contracted an indebtedness of over $30,000. This indebtedness was largely to banks, and the court said: "In this case we think it clear that the banks could have recovered

[3]

of the stockholders, for the reason that those conducting
the business of the corporation had created this indebted-
ness for the benefit of the corporation."

In German National Bank v. Louisville Butchers' Hide
& Tallow Co., 97 Ky., 34 [29 S. W., 882], the notes were
discounted by the corporation at the German National
Bank, and upon these notes suits were brought. It was
sought to defeat a recovery upon them upon the ground
that the act of discounting notes was *ultra vires*. The cor-
poration got the proceeds of the notes, and the court held
that a corporation could not hold on to the money and re-
pudiate the act by which it had got it. The court ap-
proved what Brice on Ultra Vires said (2d Eng. Ed., 769),
to-wit.: "In every case a corporation must account for
benefits which it has received in an *ultra vires* transaction.
This is a well-known equitable doctrine. It has been ap-
plied, not only to persons of full age, and under no dis-
ability, civil or mental, but also. to those who are under
some incapacity—infants and lunatics. From these per-
sons the principle has been extended to corporations."

It is suggested the conclusion which I have reached is
in conflict with the case of First Nat. Bank of Covington
v. D. Kiefer Milling Co., 95 Ky., 104 [23 S. W., 676]. In
that case it appeared that the corporation became indebted
to the bank in the sum of $77,000, in violation of its articles
of incorporation, which only authorized it to incur an in-
debtedness not to exceed $30,000. The corporation was
insolvent, and the court below adjudged that the bank
should participate ratably in the distribution of the estate
on $30,000 of its debt, and this court concurred in that
view. The court in that case did not decide what would
have been the effect of the violation of the provision of
the articles of incorporation if it had been simply a ques-
tion between the bank and the corporation.

As the reason for sustaining the judgment of the court below, the court said: "But the enforcement of that provision is demanded by the assignee for the benefit of other creditors, who have been prejudiced by the unauthorized and illegal dealing of the bank with an unfaithful officer of the milling company, whereby its insolvency was precipitated, if not actually caused; and in such case a participant in the fraudulent transaction, not other innocent creditors, should suffer."

It appears from the opinion that the fraudulent conduct to which reference was made in the part of the opinion just quoted was that of George M. Kiefer, in discounting at the bank, and receiving the proceeds of, drafts purporting to have been signed by the corporation. If the bank was a participant in the fraudulent transaction of an officer of the corporation in discounting drafts purporting to have been drawn by the corporation, the court properly adjudged that innocent creditors should not suffer. Indeed, if the alleged indebtedness had been created by the bank participating in a fraudulent transaction with one of the officers of the corporation, it should not have been permitted, to any extent, to participate in the distribution of the estate.

If the Bank-Kiefer case be construed to mean that a creditor, who has not been guilty of participating in a fraudulent transaction by which his debt was created, can not enforce his debt, because the corporation debtor, in making it, exceeded the limit fixed by its articles of incorporation, it is in conflict with Haldeman v. Ainslie and German Nat. Bank v. Louisville Butchers' Hide & Tallow Co. If it can be construed as holding that, although the creditor was not guilty of participating in a fraudulent transaction, its debt can not be enforced in the settlement of the

36          KENTUCKY REPORTS.          [Vol. 106

Bell & Coggeshall Co., The, &c., v. Kentucky Glass Works Co., &c.

estate of its insolvent debtor, then it is neither supported by reason or authority, and is in conflict with the legal deduction which logically flows from the Haldeman and German Nat. Bank cases.

The evidence in this case does not tend to show that the bank participated in any fraudulent transaction, or that any officer of the glass company was guilty of any fraudulent conduct, as all the money which was obtained from the bank by the officers of the corporation was used for its benefit. If the bank's debt could have been enforced against the corporation before it became indebted to the other creditors, the mere fact that it so became indebted would not invalidate its claim; neither would the insolvency or subsequent assignment of the glass company's property affect its validity.

If the rule enunciated in this case is to prevail, who should suffer in the settlement of the estates of insolvent corporations which have violated the provisions of the charters? Is it to be the creditor who has the largest debt, contracted before the debts of the other creditors? Why single out such a creditor, and say, because the indebtedness of the insolvent corporation to it is greater than the amount of indebtedness which it is authorized to contract, that such creditor shall participate in the distribution of the trust estate only to the extent of an amount equal to the liability which the corporation was authorized to incur, and then say to all creditors whose debts are contracted after the corporation has exceeded its limit of authorized indebtedness that, "as your several debts are less than the amount of the indebtedness which the corporation is authorized to contract, you may participate in the distribution of its insolvent estate to the full amount of the debts which you hold?" If the court is

to lay down a rule that the charter provision limiting the indebtedness is to be enforced, it reasonably follows that the creditor whose debt was contracted within the limit of, and before the corporation exceeded, its authority, should alone participate in the distribution of the estate, because the debts of all other creditors were contracted at a time when the corporation was not authorized to do so, and would be unenforceable. If the large creditor is presumed to be acquainted with the articles of incorporation of its debtor, and to know whether or not it is exceeding its authority in incurring it, the subsequent and small creditor is bound by the same presumption.