## American Southern National Bank v. Smith, Banking Commissioner, et al.

(Decided June 1, 1916.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, Third Division).

1. Corporations—Powers, Authority and Limitation—Notice.—Persons dealing with a corporation must take notice of the powers, authority and limitations conferred upon it by the provisions of its charter.

2. Corporations—Debt Contracted in Excess of Authority Ultra Vires.—When the charter of a corporation contains a provision limiting the amount of indebtedness which it may incur, a debt contracted in excess of the limitation is ultra vires, and if the offending corporation should become insolvent, the creditor to the excess of his debt above the limitation may not assert it as against the other creditors not parties to such violations, nor can such offending creditor hold or appropriate to the extinguishment of such excesses, collaterals or other security given to him by the offending corporation.

3. Banks and Banking—Ultra Vires Contract—Power of Commissioner.—The bank act passed by the Legislature of 1912, wherein provision is made for inspection and visitation of the banking corporations and for the appointment of a banking commissioner

to cause such inspection and visitation and to take charge of and wind up insolvent banks, is in furtherance of a sound public policy, and is intended to cover the entire field concerning the regulation of banks and winding up of insolvent ones, and therefore vests in the commissioner the right to the remedy to correct the abuses of an ultra vires contract whensoever any creditor may have done so.

4. Banks and Banking—Insolvency—Banking Commissioner May Maintain Action Against Lending Bank for Collateral.—When a bank borrows money in excess of the limitations provided by its charter and deposits with the lending bank collaterals of the former, and the borrowing bank afterwards becomes insolvent and goes into the hands of the Banking Commissioner for settlement, he may maintain an action against the lending bank for the collaterals, or the proceeds thereof, held for the excess of the debt above the charter limitations.

5. Banks and Banking—Powers of Banking Commissioner—Action By.—Where the charter of the A bank limited the indebtedness which it might incur for borrowed money to $10,000.00, and it in violation thereof borrowed from the A S Bank $33,000.00, and deposited as security therefor collaterals of the A bank to the amount of $35,000.00, and also deposited with the A S bank $10,000.00, and afterwards became insolvent and was taken charge of by the Banking Commissioner who sued the A S bank for the collaterals as well as for the deposit in excess of $10,000.00, the sum which the A bank was permitted by its charter to borrow. Held, that he was entitled to maintain the action and to recover, it being shown that it would require the sum sought to be collected to pay the depositors and other creditors of the insolvent bank.

HENRY BURNETT, W. H. BATSON and GRADDY CARY for appellant.

JOHN J. WILLIAMS and JOHN M. LASSING for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

In 1906, the George Alexander & Company bank was duly incorporated as a banking institution with its principal office and place of business at Paris, Ky., and had a capital of $40,000.00, divided into shares of $100.00 each; and by its charter, which was executed on the 11th day of April of that year, it was authorized to engage in and conduct a general banking business in the State of Kentucky. Since that time its charter has been amended to the extent of changing its name to "George Alexander & Company State Bank." In all other respects its articles of incorporation are the same as when first exe-

cuted, and reference will hereafter be made to it as the
Alexander bank. The eighth clause of its charter is in
these words:

"8th. The highest amount of indebtedness or li-
ability which the corporation may incur, shall not at any
time exceed ten thousand dollars ($10,000.00), over
and above its liabilities to depositors and its liabilities
upon bills of exchange, checks or drafts upon other
banks having its funds upon deposit."

The appellant (whom we shall hereafter refer to as
defendant), is a banking institution with its prin-
cipal place of business located in the city of Louisville,
and when first organized, its name was American Na-
tional Bank, but since then its name has been changed by
proper proceeding to the one it now has, American Sou-
thern National Bank.

On July 1, 1907, the Alexander bank borrowed from
the defendant the sum of $15,000.00, executing its note
therefor, and on December 31, of the same year, it bor-
rowed an additional $18,000.00, for which it executed its
note, and to secure the payment of both these notes, it
entered into a contract with the defendant by which it
pledged to the latter, solvent notes to the aggregate
amount of $35,000.00, and in addition thereto, agreed to
keep on deposit with the defendant until the payment of
the two notes, a sum of not less than $10,000.00. The
indebtedness represented by these two notes was not re-
duced by the Alexander bank, nor was there any change
in the collaterals except, perhaps, that some of them
were from time to time removed, and other collaterals
with equal solvency would be substituted for the orig-
inals.

With matters in this condition, the Alexander bank
was, on May 19, 1914, under the Act of the Legislature
of 1912, relating to banks and providing for a Banking
Commissioner, duly and regularly placed in the hands
of the appellant, who was then and is now the Banking
Commissioner for this State. There is no question made
in the case but that the Alexander bank was at that time
hopelessly insolvent, it being agreed that its in-
debtedness to its depositors and some other creditors
ors amounted to more than $100,000.00 above its assets.
After taking charge of the Alexander bank, the plaintiff
demanded of the defendant the payment to him of the
deposits which the Alexander bank had with defendant,

then amounting to $10,837.45, and further demanded that it deliver to him the collaterals which it held to secure the payment of the two notes mentioned, but both of these requests were refused. The plaintiff, as such commissioner, in making these demands, proceeded upon the theory that inasmuch as the two notes aggregating $33,000.00 exceeded the limitation provided for in clause eight of the charter of the Alexander bank, *supra,* it was *ultra vires* and void, and that he was entitled to recover, not only the deposit, but the collaterals. as well, all to go into the general fund for distribution among the creditors.

After the refusal of the defendant to comply with these requests, this suit was instituted against it for the purpose of compelling it to do so, which resulted in a judgment against it for the excess of the combined sum of the collaterals which it had collected, plus the deposits over $10,000.00, the limit of the indebtedness which the Alexander bank could contract. The defendant, after the declared insolvency of the Alexander bank, had collected a sufficiency of the collaterals, together with the deposit to pay its entire indebtedness, and it delivered to the plaintiff the remaining collaterals, which it had not collected; the total amount of the judgment being $25,573.64, with interest from January 5, 1916, the date of its rendition.

It is first insisted that the right to bring this character of action, if one exists at all, is not vested in the Banking Commissioner; but the relief sought, if available at all, can be prosecuted only by a creditor, or creditors. In other words, that the Act of 1912 and the general laws of the land, as is announced by the courts and text-writers, do not vest the Commissioner with any greater powers or rights than were possessed by the insolvent bank, whose business he is engaged in winding up, and that the bank, as such, would not have had the right to maintain this action without at least tendering back to the defendant the consideration which it received for the two notes. It seems to be conceded that the execution of the two notes by the Alexander bank was *ultra vires* at least as to the excess of $10,000.00. The decisions of the courts in regard to the powers and rights of a receiver, or an assignee for the benefit of creditors, are not by any means binding precedents in the determination of the question which we have before

us. The Banking Commissioner is not a receiver appointed by the court, nor is he an assignee for the benefit of creditors in the ordinary acceptation of that term. In the one case, the authority, rights, and powers of the receiver are qualified and restricted by the court appointing him, while the assignee for the benefit of creditors obtains his authority, rights and powers from his assignor; and in the very nature of things, he cannot confer upon his assignee that which he did not possess. The banking business throughout the country has in modern times grown to such an extent that almost the entire commercial activities of the country are conducted through and by banks. Thep are the repositories of the larger per cent. of all the money of the country, and because of these and other conditions, through and by which they are so intimately associated with business and with the individual citizen, the countries under which they are organized have long since considered them appropriate institutions for statutory regulation, to the end that their solvency may be safeguarded, and that the citizen depositing his money therein may be assured, as much as possible, that upon demand it will be forthcoming. Sound public policy, therefore, has long since determined that this character of corporations are subject to the visitorial powers of the government creating them, which is manifested by the character of legislation embodied in the Act of 1912, passed by our legislature. These observations are fortified by the author of Thompson on Corporations, 1st ed., sec. 460, wherein it is said:

"Perhaps no class of corporations are more completely under police regulations of the States than banking companies. The police power, in its visitorial aspect, as exercised by Congress and the several States, extends to the minutest details of the banking business. These corporations are not, strictly speaking, *quasi* public in their nature; but they are of such a character that the State can and does protect the public by any and all reasonable regulations necessary to that end. The peculiar relation that banks sustain to the public, and by this is meant their depositors, is such that it is the business and the duty of the State to see that corporations embarking in such an enterprise are entitled to the confidence of the public, and that depositors who in good faith entrust their money to these institutions shall be

protected.   It was said by one court that 'it is conceded that the business of banking, by reason of its very intimate relations to the fiscal affairs of the people, and the revenues of the State, is, and has ever been considered a proper subject of legislative control, and strictly within the domain of the internal police power of every State.' ''

And in the same section, quoting with approval from Blaker v. Wood, 53 Kans. 499, 24 L. R. A. 854, it is said:

"Enactments controlling the loaning of money, and regulating the rate of interest upon the same, have been sanctioned from the earliest times, and the nature of the business done by banks in dealing in money, receiving deposits for safekeeping, discounting paper, and loaning money, is such, and is so affected with a public interest, as to justify reasonable regulation for the protection of the people.   The confidential and trust relations which exist between the bank and its patrons, and the difficulty that depositors and those dealing with the bank necessarily encounter in detecting irregular practices and in ascertaining the real financial condition of banks, are sufficient to justify inspection and control.''

In furtherance of these general purposes which it is evident the statute was intended to foster and encourage, we are disposed, if the question was one of first impression, to construe the statute so as to vest the Banking Commissioner, when winding up the affairs of an insolvent bank, with all the powers and authority in the collection of the distributable assets of the bank, that a creditor himself would have in a proceeding which he might institute for that purpose.   As illustrating the general doctrine in regard to the powers, rights, and authority of those entrusted with the duty of winding up the affairs of insolvent corporations, as well as the modern tendency of the courts in extending and enlarging those powers so as to accomplish the purpose in view, and to avoid a multiplicity of suits, reference may be had to sections 2850, 5158, 5159, 5360, and 6396 of Thompson on Corporations.   From section 5158, we quote:

"But this rule (that the receiver takes no greater right than the corporation) is subject to the exception that a receiver so far represents the general creditors that he is authorized to avoid transactions in fraud of their rights.''

And again from section 5159:

"However, the receiver's powers and authority have been necessarily and beneficially enlarged in some States by statute, and in other States by judicial interpretation. * * * Other cases illustrate the doctrine that a receiver may assert rights which the corporation or its management could not enforce."

In section 6396 of the same works, we find it stated:

"Some of the courts take the view that the receiver stands in the shoes of the corporation itself, the same as a voluntary assignee stands in the shoes of his assignor, and cannot maintain any action or set-off in defense which the corporation itself could not have maintained or set-off. But this is generally regarded as a narrow view, for the receiver is generally given the right to litigate for the benefit of creditors where acts have been done in fraud of their rights, though the act in question may be valid as to the corporation itself."

Numerous authorities are cited to support these various texts, but this court upon at least three occasions has had under consideration our banking act relative to the powers which it confers upon the Banking Commissioner, in which it used language impliedly, if not expressly, upholding the right of the Commissioner to prosecute this character of suit. These are to be found in the three cases of Commercial Bank and Trust Co., &c. vs. Citizens Trust and Guaranty Co. of West Virginia, 153 Ky. 566, and Cartmell, et al. v. Commercial Bank & Trust Co., et al., 153 Ky. 798; and Smith, Banking Commissioner, et al., Ex Parte, 160 Ky. 83.

In the first case mentioned the Commercial Bank & Trust Company, organized under the laws of this State with powers to conduct a general banking business, and engaged in such business in the city of Louisville, arranged with Lloyd W. Gates, the Treasurer of Jefferson county, for him to deposit the money which he held as treasurer with it, and to secure him in such deposit, it executed to him a bond with the Citizens Trust & Guaranty Company of West Virginia, as its surety, but deposited with its surety, under an agreement to do so, in pledge, the sum of $100,000.00 of its assets, consisting of certificates of deposits and negotiable notes. Subsequently, and on January 13, 1913, the Commercial Bank & Trust Co. was placed in the hands of the Banking Commissioner, under the provisions of the Act of

1912. A controversy arose as to whether the Guaranty Company could hold these collaterals, and if not, whether they could be recovered by the Banking Commissioner. It was alleged by the surety of the bank, the Guaranty Company, that its liability as such surety would be greater than the collaterals which it held, but the commissioner insisted that these collaterals were a part of the assets of the defunct Commercial Bank & Trust Company, upon the ground that it had no authority to so use them. He further insisted that he, as such commissioner, had the right to recover them for the benefit of creditors. The case was decided against him by the lower court, but upon appeal to this court the judgment was reversed and the contention of the commissioner was upheld. In a very exhaustive and lucid opinion, the court upon the questions which we have discussed, said:

"There being no express authority given to a bank to secure a deposit, by pledge of its assets, and it being apparent that such a practice would have a tendency, and pave the way, to the perpetration of fraud, by putting it in the power of the officers of a bank to give a preference to favored customers, it cannot successfully be maintained that a bank has the implied right or power to do so. Banks undoubtedly have the right to do many acts and things not expressly authorized by their charters, or specifically designated in the general laws adopted for their organization, regulation and government. These are termed implied powers, but such powers are those found necessary to enable the banks properly and expeditiously to carry out and enjoy the powers, rights and privileges, expressly given them. Before a bank should be adjudged entitled to exercise any power, not expressly given, it should be clearly established that such power is essential to the proper conduct of its business and necessary to enable it properly to enjoy, use and carry out its express powers. When such test is applied to the claim of right, on the part of a bank, to prefer one of its depositors over another, it is apparent that the right should be denied. The exercise of such a power would necessarily be fraught with great possibilities for the perpetration of fraud, and would undoubtedly have a tendency to destroy the faith of the depositing public in banking institutions."

And further on in the opinion it is said:

"The rigid enforcement of this principle will not deprive banks of the right to exercise any of their legitimate functions; but, on the contrary, will build them up in the confidence of the depositing public; for, when depositors know that the bank not only may, but must, deal fairly with them, banks will take that position in the confidence of the public in which these great institutions deserve to be held. * * * If banks are made to observe strictly the law and not allowed to divert their assets from their proper and legitimate channel, it will be in rare instances indeed that depositors will feel the need of special security for their funds when placed in banks."

In the latter case referred to, a number of depositors of a bank sought to oust the Banking Commissioner after taking charge of an insolvent bank which had properly gone into his hands and to substitute in his place a receiver to be appointed by the court. The opinion goes into a thorough consideration of the object and purposes of the legislature in passing the banking act of 1912, as well as the ends to be accomplished and the means by which they should be accomplished, and concludes by holding that the method provided by the act for the winding up of an insolvent bank, through the commissioner therein provided, is exclusive, and the right contended for, to have a receiver appointed after the Banking Commissioner had taken charge, was denied. In the course of the opinion it is said:

"This legislation has, as its ultimate aim, the protection of the depositing public, and it is doubtful if any legislation enacted in recent years is calculated to have so beneficial an influence and effect. * * * The object and aim of the law, in the appointment of a receiver, is to see that the assets of the institution in charge of which he is placed, are properly, honestly, and economically administered. The ends of the law are satisfied, if the estate is administered in this way, whether the person charged with its administration be termed a banking commissioner, a trustee or an assignee."

In the Smith, Banking Commissioner, Ex Parte, case, the question was, whether the Banking Commissioner had a right to sell the real estate belonging to the defunct bank without an order of court directing him to

do so. It was held that although the act was silent upon that question, still the general purposes of the act were broad enough to give him that power, the language used being as follows:

"The banking act is silent upon these matters except that as it authorizes and directs the Banking Commissioner to liquidate insolvent banks, by implication it authorizes him to dispose of the real estate belonging thereto. * * * The banking act confers upon the commissioner extraordinary powers, and it should be given a broad and liberal interpretation."

Considering the purposes and intention of the legislature in enacting the law, as well as the tendency of the courts to facilitate as much as possible, and with as little cost as possible, the winding up of insolvent banks, as well as the trend of this court, as exhibited in the opinions, *supra*, we are convinced that this action was properly brought by the Banking Commissioner.

Strictly speaking, a corporate contract was at first declared to be *ultra vires* only when it was entirely without the scope and purpose of its charter privileges, and did not pertain to the objects for which the corporation was chartered. (Section 2768, Thompson on Corporations, vol. 10, Cyc. 1146). For a long time this restrictive definition prevailed, and the courts holding to this narrow definition declined to enforce the contract at the instance of either party upon the ground that it was wholly void, but would leave the parties where it found them. But the modern definition of such a contract has been broadened so that the designation now includes, not only those contracts just mentioned, but also others which are beyond the limitations of the powers conferred by the charter, although within the purposes contemplated by the articles of incorporation. That the contract in question, at least to the extent of the loan to the Alexander bank of more than $10,000.00, comes within the latter definition, is clearly beyond question. It is so held by a great many courts, and most of all the text-writers, and by this court in at least the two cases of the First National Bank of Covington v. The D. Keifer Millinery Co., 95 Ky. 97, and Bell & Coggeshall Co., The, Etc. v. Ky. Glass Works Co., Etc., 106 Ky. 7.

Having, then, seen that the suit can be maintained by the Banking Commissioner, and that at least to the

extent of $23,000.00 the debt which the Alexander bank created with the defendant was *ultra vires,* it remains to determine what are the rights of the parties under the conditions presented by the record. It is earnestly insisted by counsel for appellant: (1) That the contract, being *ultra vires,* is void and that neither party can obtain any relief under it from the courts, and (2) that if this should be incorrect, that the Alexander bank, or the Banking Commissioner who represents it, should be required to return the consideration for the *ultra vires* portion of the contract before any relief should be given.

As to the first contention, it might be correct, which, however, is not decided, if the contract was of the *ultra vires* nature within the first definition given above, but not being of that character, the position of counsel is wholly untenable.

In support of the second contention, it is earnestly insisted that the defendant is an innocent party, and that it had no notice of the limitations in the articles of incorporation of the Alexander bank, and that it is, therefore, entitled to be placed in *statu quo* by either the consideration of the *ultra vires* portion of the contract returned to it, or that it should be permitted to recover against the plaintiff on a claim for money had and received by the Alexander bank. It may be true that the defendant did not have actual notice of the limitations in the charter of the Alexander bank, but under all of the authorities, including the cases upon the subject from this court, it was charged, at the time of the lending of the money with constructive notice of such limitations. This principle is stated in Thompson on Corporations, section 2802, thus:

"The rule (of constructive knowledge) also applies where a corporation having apparent power to do so purchases paper or borrows money, and without the knowledge of the other party, does so for an unauthorized purpose, or in excess of the lawful debt limit."

In the Keifer Milling Company case, *supra,* upon this point, this court said:

"The articles of incorporation were, as required by statute, recorded and, independent of presumed notice by the First National Bank of Covington, of the provision in regard to the limit of indebtedness, the D. Keifer Milling Company was empowered to contract, it is a well settled rule that a person dealing with a cor-

poration must, at his peril, take notice of its charter or articles of incorporation. (See Morawetz on Private Corporations, volume 2, sections 591, 592.)"

And in the Kentucky Glass Works Company case, *supra,* upon the same point, it said:

"Independent of the fact that its articles are accessible in the county clerk's office or in the office of the Secretary of State, every one dealing with it is bound, at his peril, to know the limitations of its powers, just as a person dealing with an agent, must, at his peril, ascertain the extent of the agent's authority."

The rule was reiterated by this court in the case of Citizens Bank v. Bank of Waddy, 126 Ky. 169, wherein it was said:

"The limit of indebtedness for borrowed money which the Bank of Waddy could contract was $7,500.00, and every person dealing with the corporation is charged with notice of its powers under its articles of incorporation."

We must, then, deal with the question as though the defendant, when it loaned the money, knew at the time that the Alexander bank did not have power under its charter to borrow money in any sum exceeding $10,000.00. We are cited to a great number of cases from many states, as well as from the Federal courts, to the effect that a corporation, as such, when sued upon the character of contract under consideration cannot rely upon the want of its power to make the contract without returning to the other party the consideration which it received, but in each case, the facts were, that the corporation which had exceeded its powers and which the courts said must do equity by returning the consideration, was a solvent and going concern. No question as to the rights of creditors was involved, and the holding of the courts in such cases may be conceded to be correct, especially so far as this case is concerned, because those composing the corporation, being the stockholders, could not complain, as they had received the consideration and perhaps appropriated it for corporate purposes. The creditors of such corporations could not complain because they were only interested to the extent of their respective debts, and as the corporation was solvent, thus guaranteeing the payment of its debts, there remained nothing upon which the *ultra vires* nature of the contract could operate. As neither

the corporation nor the stockholders in such a case could complain, and there being no necessity for a creditor to complain, there existed no obstacle in the way of applying the doctrine contended for. The rule, however, is altogether different when the borrowing corporation to such an *ultra vires* contract is insolvent. In section 2850, Thompson on Corporations, it is said:

"Certainly in the case of an insolvent corporation, the act may be disaffirmed by the receiver in behalf of the creditors." See also First National Bank of Covington v. D. Keifer Milling Company, 95 Ky. 97; Bell-Coggeshall Co. v. The Kentucky Glass Works Co., 106 Ky. 7; Citizens National Bank v. Bank of Waddy, 126 Ky. 169; Casey v. Cavarve, 96 U. S. 467; Kraniger v. People's Building Society, 60 Minn. 94; Bank of Chattanooga v. Bank of Memphis, 9th Heisk (Tenn.), 408; Morse on Banking, sec. 749b.

In the Keifer Milling Company case, *supra,* the milling company, being a corporation, was not authorized to become indebted by its charter in a sum exceeding $30,000.00. It had, however, become indebted to the First National Bank of Covington in the sum of $77,-000.00. The milling company made an assignment, and the bank filed its claim for the amount of the debt, and sought a pro rata upon the entire amount of it, but this court refused to allow it to participate in the assets only to the extent of $30,000.00, being the amount of the indebtedness which the milling company was authorized to contract, and in doing so, said:

"Whether if this was simply a contest between the bank and the milling company, violation and disregard by the latter of the provision of the articles of incorporation would be a sufficient defense, we need not determine; but the enforcement of that provision is demanded by the assignee for benefit of other creditors, who have been prejudiced by the unauthorized and illegal dealing of the bank with an unfaithful officer of the milling company, whereby its insolvency was precipitated, if not actually caused; and in such case, a participant in the fraudulent transaction, not other innocent creditors, should suffer."

In the Kentucky Glass Works Company case, there was a provision in the articles of incorporation of the borrowing corporation, that: "The highest amount of indebtedness, or liability to which said corporation should at any

one time subject itself shall be $8,000.00.'' This corpora-
tion was the Kentucky Glass Works Company, and being
insolvent, it made an assignment for the benefit of its
creditors, which was followed by a suit to settle its
estate. It had before that time contracted an indebted-
ness by borrowing money from the Kentucky National
Bank, amounting to $48,600.00, to secure which it had
executed a mortgage upon its property, and in the set-
tlement suit, the bank attempted to enforce its mortgage,
but this court declined to give it the relief which it
sought, because, and only because, its debt exceeded the
limit prescribed in the charter of its borrower, the Ken-
tucky Glass Works Company; the court saying:

''Were this question between the corporation and
the bank, there would be little difficulty. In this case,
it appears that the money was actually received by the
company, and used in its business, and the company
would be estopped from refusing to make restitution of
that whereof it had received the benefit. * * * A
creditor whose own debt against the corporation does
not transgress the limitation—who does not know, and
has no reason to know, that the limitation had been ex-
ceeded, has a right to rely upon the 'implied warranty
on the part of the corporation through its officers, that
the power has not been exhausted, and that the condi-
tions do not exist which render it unlawful for the cor-
poration to contract the debt.' And this reason, it seems
to us, applies equally as against the creditor who partici-
pated in creating the excessive indebtedness, and was
bound to know that it was so doing. The bank was
charged with knowledge of the indebtedness limit in the
articles of incorporation of the company. In the face of
that knowledge, it joined with the company in the cre-
ation of an indebtedness against it far in excess of what
the company was authorized to incur. The bank knew
that the indebtedness was being exceeded; the other
creditors did not; and this puts them, in our judgment,
upon an entirely different footing.

''An immense number of citations have been made
by counsel; most of them are cases between the corpora-
tion and the creditor, or between the shareholders and
the creditor, in which the corporation or shareholders
sought to evade the payment of the excessive indebted-
ness on the ground that it was *ultra vires*.''

The court then proceeds to the consideration of many questions now urged upon us by counsel for defendant deciding each of them against his contention, one of which is, that the only effect to be given to the limitation of indebtedness in the articles of incorporation is, that it might afford grounds for a proceeding by the State to annul the charter, and that this should be the only effect given to it, but this court in the opinion, *supra,* in answering that contention, said:

"In this Commonwealth such a doctrine would render the inhibition of the statute an absolute dead letter. Of what avail would it be to obtain a judgment of ouster and dissolution of the corporation at the suit of the State, when it could be reincorporated in half an hour's time? What attention would be paid to this inhibition in the statute by persons contracting with corporations, if the only penalty for a violation of the statute were a possible dissolution of the corporation? Moreover, it is hard to discover what ground the Attorney General would have for hoping to succeed in a suit for ouster and dissolution of a corporation for the offense of making a valid contract.

"But it is sufficient to say that this is not the doctrine in Kentucky. In this State it has been adjudged that such a contract, made in violation of law, while enforceable as between the parties, is not enforceable by either participant as against the rights of third persons."

It is, however, contended that the creditors of the Alexander bank have not been deprived of anything, and their rights, consequently, not impaired, because that bank, at the date of the borrowing of the money, got value received, and consequently the assets of the banks were not depleted, or impaired, and therefore the creditors have no equities justifying the plaintiff as their representative, in prosecuting this action. In reply it may be said, that it is exceedingly likely that many of the creditors of the Alexander bank, at the time the commissioner took charge of its affairs, may not have been such in 1907, at the date of the borrowing of the money. Furthermore, the purpose of the limitation is to not allow the officers of the bank to have an opportunity to misappropriate by way of unauthorized dividends, or otherwise, the proceeds of an unauthorized borrowing, and thus imperil the security of creditors by

unlawfully increasing the indebtedness of the corporation. However this may be, it is sufficient to say that in the cases from this State *supra*, the rule is held to be as indicated and not to be affected by this circumstance.

We are earnestly urged to retract the doctrine of the two cases of First National Bank of Covington v. The K. Keifer Millinery Co., 95 Ky. 97, and Bell & Coggeshall Co., Etc. v. Kentucky Glass Works Co., Etc., 106 Ky. 7, from this court, but we are by no means convinced that it is our duty to do so. Aside from the fact that the doctrine therein announced has remained in this State unimpaired for more than twenty years, during which time many legislatures have met without making any effort to change the rule, we are convinced that the rule announced by those cases is both a wholesome and sound one, and especially so when applied to banking institutions. As stated in an earlier part of this opinion, they are the arteries of commerce, and the laws looking to the preservation of their financial integrity should be strengthened rather than weakened. Many of them hold in their coffers the accumulations of a lifetime in the way of deposits, and if those dealing with them are not to be charged with a knowledge of the limitations found in their articles of incorporation, and visited with some penalizing consequences should such limitations be violated, the door would be opened for a diversion of the assets of the corporation from their proper and legitimate channels, and the security of creditors, including depositors, would be rendered exceedingly hazardous, and the healthful condition and prosperity of the bank would be endangered. It is better that the rule should be adhered to, even though in isolated cases it might work a hardship, than for it to be withdrawn, followed by the possible consequences which we have considered.

This will impose no onerous burden upon the prospective creditor. In fact, it is but requiring him to do that which, from time immemorial, has been a rule observed and followed by the prudent business man, and that, too, at a time when there was no sort of limitation upon the authority of his prospective debtor to become indebted. This business rule says to the lender of money to be secured by real estate liens, "examine the title by referring to the abstract." It also says to the prospective creditor, when taking personal security for his debt, "investigate the solvency of the makers of the

note." It says to the prospective purchaser, "look well to the title;" and it says to the ordinary transaction whereby an obligation is assumed to another, for the latter to require and obtain security from the former that he will fully perform his contract. If, without any law imposing limitations upon the authority to contract, business prudence demands these precautions, it is difficult to see how it could be considered exacting for the law, in order to protect others who are entirely innocent, and who confide, and have a right to confide, in the belief that the required limitation is intended to have some purpose, the most feasible of which was for their protection, to deny to the derelict creditor the full fruits of his bargain as against other innocent ones. There are three ways by which the contemplated creditor may inform himself; he can investigate the records of the county court at the home of the corporation; the same information can be obtained from the office of the Secretary of State, at Frankfort, and lastly, he can say when applied to, "although I am not from Missouri, show me." We are convinced that it is no difficult task to see upon which side of the proposition the interest of public policy lies.

There can be no difference in the application of this rule upholding the liability as to how the offending creditor gets into court. It is equally applicable to him when he is brought into court by process, as when he voluntarily enters there for the purpose of enforcing his debt. The remedy given is not for the purpose of punishing him for voluntarily coming into court, but to divest him of property wrongfully obtained and withheld as against the corporate creditors.

We, therefore, conclude that the judgment appealed from is correct, and it is affirmed.

Whole court sitting.