A plan of reorganization has been submitted by the Mechanics Trust Company, which seventy-five per cent. of its depositors, creditors and mortgage participation certificate holders have consented to in writing. Two-thirds of its stockholders of outstanding capital stock have likewise consented to the plan. The court's approval is sought.
This court issued an order directing the company's depositors, creditors and certificate holders to show cause why the plan should not be approved as fair and equitable. The order also provided that those who did not consent in writing to the plan, should file their dissent, and failing to do so, they would be deemed to have consented to it, and would be bound thereby.
The proceedings are based upon chapter 116, laws of 1933, and the acts amendatory thereto, viz., chapter 407, laws of 1933, and chapter 221, laws of 1935. The statute provides that any bank, trust company, c., which is insolvent or the possession of its property or business has been taken by the commissioner of banking and insurance, may be reorganized and permitted to resume its normal and usual business upon such terms and conditions as may be approved by the commissioner of banking and insurance, and the court of chancery, after notice of the terms and provisions of the proposed reorganization plan and after a hearing by the court shall have been given to the depositors, creditors and stockholders; and that upon such approval of the plan, it shall become *Page 143 
effective and binding upon all the depositors, creditors and stockholders if the court shall find, inter alia, that the plan is fair and equitable to the depositors, creditors and stockholders.
The plan, briefly, provides that the depositors shall receive forty per cent. of the deposits in cash and the balance of sixty per cent. in preferred "B" stock of the reorganized bank. The bank certificate of incorporation has been amended to permit the issuance of two classes of preferred stock — class "A" and class "B." The first named class "A" goes to the Reconstruction Finance Corporation in exchange for a loan of $100,000 made, or to be made, by it to the bank. The other class, "B," is to be issued to the depositors and creditors who are not certificate holders. The certificate holders are required to surrender their certificates for which they receive new certificates evidencing their interest in the particular mortgages under which the certificates were issued in connection with each series — the trust company having observed the plan of issuing mortgage certificates in series. In addition to the exchange of certificates, the trust company sets up a special fund of approximately $86,000 for the benefit of such certificate holders to secure them against loss. Some of the mortgage participation certificates are held by the trust company in its trust department; these, in effect, amount to a preference because the institution would be liable as a trustee and obliged to pay.
There is a reserve of $75,000 set up to secure the beneficiaries of the trusts against loss. It is estimated that the whole of this reserve fund will be available for the mortgage participation certificate holders generally, in addition to the reserve of $86,000.
The $86,000 trust fund is to consist of bonds secured by mortgages or other obligations secured by mortgages, which will include a note mortgage or a note and mortgage. Such bonds and obligations and mortgages must be held until all losses are determined, in order to insure fair distribution among those entitled. The amount of the second mortgages and obligations to be taken by the trust company are indicated on the mortgages and the properties underlying each *Page 144 
series. As to what bonds and obligations and mortgages are to be set up in the trust fund, the selection is to be made by representatives of the certificate holders and of the reorganized trust company. The approval of the federal agencies is only to be had if they require it.
At the hearing, proof was submitted to sustain the plan as fair and equitable to all of the interests concerned. The depositors, creditors and stockholders who have assented to the plan, are far in excess of the percentage required by the statute; while the dissensions constitute but a very small minority of the aggregate depositors and mortgage participation certificate holders.
The objections urged by the dissenters may generally be classed as follows: (a) denial of knowledge or information to form a belief as to whether or not the plan is fair and equitable; (b) that it is misleading, or inconsistent; (c) that the legislative acts under which the plan is presented are unconstitutional; (d) that they, the objectors, were depositors prior to the adoption of the 1935 act, in consequence of which that act or "prior statutes to which it is an amendment" are unconstitutional as violating paragraph 3, section 7, article 4 of the state constitution and article 1, section 10, of the federal constitution providing against the impairment of contracts; (e) that the plan is indefinite in that it is subject to changes, additions or amendments, material or otherwise, by government agencies without giving the defendants any voice in the proceedings, or opportunity to be heard with regard to their moneys, thus denying them their constitutional rights — depriving them of their property without due process of law; (f) that the reserve fund set up for the mortgage participation certificate holders is inadequate; (g) that the government agency (Reconstruction Finance Corporation) is given all preferences as against depositors.
Considering the objections to the fairness of the plan, paragraph 1 g. thereof provides:
"No dividends shall be declared, set aside, or paid to common stockholders until all of the Preferred Stock "A" and Preferred Stock "B" shall have been retired, nor until all mortgage participation certificate holders have been paid in full." *Page 145 
The objectors declare that this recited provision is inconsistent with the fourth paragraph of the plan. They do not specifically point out wherein it is; I fail to discover any such condition. The fourth paragraph of the plan provides that mortgage participation certificate holders are required to release the trust company from any and all liability arising out of the certificates held by them. That provision is not inconsistent with the provisions of paragraph 1 g. of the plan. The holders of the common stock are not entitled to dividends upon their stock until all of the mortgage participation certificate holders have been paid in full; and if such certificate holders are not paid in full as a result of the provisions made for their benefit under the plan, they are left in a position to deal with the common stockholders.
The objection that the government agency is given all preferences as against depositors, although the amount of money of the depositors far exceeds that of the agency, I am satisfied is entirely without substance. The government agency steps in to aid an institution crying for help and it is advancing new
money which is essential to the operation of the plan of reorganization; it is given no preference other than what is essential for its protection. The conditions imposed by the government have been embodied in the amended certificate of incorporation.
The objection that the provisions of the plan are indefinite and uncertain, and dependent upon the will of persons and agencies other than the depositors, mortgage participation certificate holders and creditors, is rather general. It is not specifically indicated in what respect the plan is indefinite or uncertain, or in what manner it is dependent upon the will of persons and agencies other than depositors, mortgage participation certificate holders and creditors. I find that the plan is not only certain, but that its terms are absolutely free of ambiguity; and it is wholly controlled by proper and lawful authority. I am satisfied that the objection last named is without warrant or justification. The dissenters urge that there is no provision that class "B" stock dividends shall be cumulative. Such provision is unnecessary because chapter 211 of the laws of 1935 provides that they shall be cumulative. *Page 146 
The amended certificate of incorporation (Exhibit P-1) states who shall have cumulative voting rights.
It is observed that some of the dissenters state that the Reconstruction Finance Corporation, by virtue of its investment of $100,000 as compared with the sum of $4,000,000 invested by creditors and depositors in the institution, will control the bank; but that objection is without basis inasmuch as the "A" stockholders will control one hundred thousand shares of stock, while the holders of "B" stock will possess one hundred and ten thousand shares.
The objection that it is uncertain whether any interest, which may have accrued on or after January 1st, 1935, is to be allowed depositors and creditors, cannot be a substantial part of the plan since all depositors will be treated alike; such an objection, therefore, will not affect the fairness or equitableness of the plan. Whatever earnings the trust company has had since January 2d 1933, will remain with the trust company, and will be part of the assets behind its stock, and the depositors, consequently, will get the benefit of it.
The certificate holders are required to release their claims to interest that has not been collected, and to surrender their certificates. If interest be paid on the bonds and mortgages, through their new certificates, they participate in it.
The dissenters say that the trust company is not required to release, although all other certificate holders are. The answer to that objection is that the trust department of the trust company cannot execute a release to itself.
Vice-Chancellor Buchanan, in Kelly v. Middlesex TitleGuaranty and Trust Co., 116 N.J. Eq. 228, observes that each assignee of a guaranteed bond and mortgage had a prior and preferential right in that bond and mortgage by reason of his purchase of such assignment; so, likewise, does each holder of the participation certificates of the bond and mortgage have a prior or preferential right in that bond and mortgage to the extent of the fractional share assigned to him. Each holder of a guaranteed participation certificate has a contingent claim against the company by reason of such guarantee — contingent upon his sustaining a loss covered by his guarantee. The vice-chancellor points out that such contingent *Page 147 
claims, if they mature into actual claims, are not restricted to any limited or particular part of the general assets of the company — any more than are any other general claims against the company. None of the participating certificate holders in the instant case have established a loss under the guarantee held by them; their claim is only contingent and uncertain. It will not mature into an actual claim until and unless the securities evidenced by the bonds and mortgages are converted into cash, through sale or foreclosure proceedings of the bond and mortgage in acquisition of the title to the real estate and the sale of that real estate for cash. If sufficient cash is realized to pay the amount of the certificates outstanding, then no claim can arise under the guarantee. Only if and when the holders are able to establish an actual claim under the guarantee have they a right to participate in the general assets of the trust company on a parity with the other general creditors.
If the trust company were now to be liquidated, the contingent claims of the certificate holders having not developed into actual claims, they, the certificate holders, would have no provable claim to participate in the distribution of the assets; and the distribution of the assets would not be delayed until such time as those claims might mature. Usher v. The SarcoCompany of New Jersey, 100 N.J. Eq. 428; Block v. BellFurniture Co., 111 N.J. Eq. 531; Kipp v. Fidelity Title andMortgage Co., 116 N.J. Eq. 409. The new certificates exchanged for the old ones give the holders an interest equal to that which they had under their former certificates in the bonds and mortgages represented by the series in which they share prorata; the holder loses nothing by the contingent and uncertain claim under the guarantee. The reserve set up for the protection of the certificate holders will be available to them for their protection no matter when their contingent claims may become actual claims. In place of the fund in which there is no protection whatever, they have a substantial fund which affords a definite safeguard — the reserve of $86,000 — for this purpose. And, secondarily, there is the fund of $75,000 set up primarily for the protection of those certificates which are held in the trust department *Page 148 
and in all probability the other certificate holders will benefit by it.
The dissenters challenge the constitutionality of the legislation upon which the plan is based. Many states of the union have legislation similar in character to that in this state which is being here attacked. The constitutionality of such legislation has been questioned in the courts of several of those states and the legislation has been in such instances upheld. Some of the decisions in those foreign jurisdictions have been taken to the United States courts on appeal and they have there been sustained. The facts in the instant case are supported by quite a number of those federal opinions and because of their sound reasoning and convincing logic, I quote extensively from them.
In Priest v. Whitney Loan and Trust Co. (Iowa),261 N.W. Rep. 374, 378, the court said:
"* * * it has been universally held by courts of last resort everywhere that contracts made with institutions such as banks affected with a public interest are likewise inherently subject to the paramount power of the sovereign state, the people — the reserve power, sometimes called the police power — to enact through the legislature, additional remedial legislation in the public interest, affecting the supervision, regulation, control, or liquidation of banking corporations."
Chief-Justice Hughes in the case of Home Building and LoanAssociation v. Blaisdell (commonly known as the MinnesotaCase), 290 U.S. 398; 78 L.Ed. 413; 88 A.L.R. 1481, said:
"To ascertain the scope of the constitutional prohibition, we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. * * *
"Not only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end `has the result of modifying or abrogating contracts already in effect.'Stephenson *Page 149 
v. Binford, 287 U.S. 251, 276; 53 S.Ct. 181, 189; 77 L.Ed. 288
(301); 87 A.L.R. 721. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while — a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this court."
After citing and reviewing previous cases, the chief-justice further said:
"It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the state itself were touched only remotely, it has later been found that the fundamental interests of the state are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.
"It is no answer to say that this public need was not apprehended a century ago, or to insist, that what the provision of the constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the constitution meant at the time of its adoption it means to-day — it is intended to say that *Page 150 
the great clauses of the constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief-Justice Marshall uttered the memorable warning: `We must never forget, that it is a constitution we are expounding' (McCulloch v. Maryland, 4 Wheat. 316, 407;4 L.Ed. 579 (601), `a constitution intended to endure for ages to come, and, consequently, to be adopted to the various crises of human affairs.' * * *
"When we consider the contract clause and the decisions which have expounded it in harmony with the essential reserved power of the states to protect the security of their peoples, we find no warrant for the conclusion that the clause has been warped by these decisions from its proper significance or that the founders of our government would have interpreted the clause differently had they had occasion to assume that responsibility in the conditions of the later day. The vast body of law which has been developed was unknown to the fathers, but it is believed to have preserved the essential content and the spirit of the constitution. With a growing recognition of public needs and the relation of individual right to public security, the court has sought to prevent the perversion of the clause through its use as an instrument to throttle the capacity of the states to protect their fundamental interests. This development is a growth from the seeds which the fathers planted. It is a development forecast by the prophetic words of Mr. Justice Johnson in Ogden v.Saunders, 12 Wheat. 213; 6 L.Ed. 606, already quoted. And the germs of the later decisions are found in the early cases of theCharles River Bridge v. Warren Bridge, 11 Pet. 420;9 L.Ed. 773, and the West River Bridge Co. v. Dix, 6 How. 507;12 L.Ed. 535, supra, which upheld the public right against strong insistence upon the contract clause. The principle of this development is, as we have seen, that the reservation of the reasonable exercise of the protective power of the state is read into all contracts."
While the United States constitution prohibits a state from passing a law which will impair the obligation of contracts, *Page 151 
still the prohibition does not remove from state control the rights and properties which depend for their existence upon the enforcement of contracts as to relieve them from the operation of such general regulations for the good government of the state, and the protection of the rights of individuals as may be deemed important. Powers, the exercise of which can only be justified on this specific ground, that they are police regulations, and which would otherwise be clearly prohibited by the constitution, can be such only as are necessary to the safety, comfort or well-being of society, or so imperatively required by the public necessity, as to lead to the conclusion that the framers of the constitution could not as men of ordinary prudence and foresight, have intended to prohibit their exercise in the particular case, notwithstanding the language of the prohibition would otherwise include it. People v. Jackson and Michigan Plank Road Co.,9 Mich. 285, 307; 2 Cooley Const. Lim. (8th ed.) 1241.
The police power is a permanent right of sovereignty; and its exercise is not alone dependent upon an emergency. Further, an emergency does not create or bestow legislative power, not otherwise constitutionally existing, but it may furnish the occasion and necessity for the exercise of such power. HomeBuilding and Loan Association v. Blaisdell, supra; People v.Title and Mortgage Guaranty Co., 264 N.Y. 69; 190 N.E. Rep. 153,156; Hourigan v. North Bergen Township, 113 N.J. Law 143, 151.
The so-called reserve power is generally referred to as the police power of the state and extends to all great public needs.Noble State Bank v. Haskell, 219 U.S. 104; but it is subject to the limitation that the exercise of the power must be reasonable under the conditions and the legislation must have a substantial relation to its object and must not be arbitrary or discriminatory. Wolf Packing Co. v. Court of IndustrialRelations, 262 U.S. 522, 535; 43 Sup. Ct. 630; 67 L.Ed. 1103;Nebbia v. New York, 291 U.S. 502, 535; 55 Sup. Ct. 505;78 L.Ed. 940. It is this test which must be applied when an emergency provokes the exercise of this reserve power by the legislature. It is immaterial whether we call the situation an emergency or not. People v. Title *Page 152 and Mortgage Guaranty Co., supra; Home Building and LoanAssociation v. Blaisdell, supra; Hourigan v. North BergenTownship, supra; Timmer v. Hardwick State Bank (Minn.),261 N.W. Rep. 456.
In Bingham v. Savings Investment, c., Co., 101 N.J. Eq. 413; affirmed, 102 N.J. Eq. 302, while Vice-Chancellor Backes did not decide the case upon the ground that the institutions there involved were public institutions, he said:
"The decision would be the same if the savings investment company were one of the companies whose franchise was to be merged and extinguished, but for a different reason. Trust companies and banks, while not public utilities, in the technical sense, for they may select their depositors, and deny borrowers, are, nevertheless, public agencies in the sense that through them the industry, trade and commerce of the country are carried on and are universally recognized as affected with an important public interest, and subject to police regulation."
In Manigault v. Springs, 199 U.S. 473; 50 L.Ed. 275
(1905), the supreme court of the United States said (at p.278):
"It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications, is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals. Familiar instances of this are where parties enter into contracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery, all of which are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, that parties, by entering into contracts, may not estop the legislature from enacting laws intended for the public good. *Page 153 
"While this power is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary."
The courts have held that where a purely private business is involved, there are limits upon the right of the legislature, by legislation adopted subsequent to the incorporation, or the issuance of stock, to change the relationship of stockholders under the reserved power to alter or amend charters, because there is a contract between the stockholders inter sese. Kean
v. Johnson, 9 N.J. Eq. 401; Zabriskie v. Hackensack and NewYork Railroad Co., 18 N.J. Eq. 178; Allen v. Francisco SugarCo., 92 N.J. Eq. 431. It has also been held that even where a purely private business is involved, the rights arising out of the supposed contract of the stockholders inter sese may be changed to some extent. Berger v. United States Steel Corp.,63 N.J. Eq. 809 (at p. 825). In this last mentioned citation the court conceived that even in the case of a purely private business, public interest and public policy might be considered as justifying a change in rights accomplished as a result of legislation passed after incorporation and the issuance of stock.
In Polk v. Mutual Reserve Fund Association of New York,207 U.S. 310; 52 L.Ed. (at p. 229), a change which affected the nature of the business against the will of minority stockholders was sustained by the supreme court of the United States, notwithstanding contract rights of stockholders based upon policies of insurance. Noble State Bank v. Haskell,22 Okla. 48; 97 Pac. Rep. 590; affirmed by the supreme court of the United States, 219 U.S. 575; 55 L.Ed. 341; German AllianceInsurance Co. v. Lewis, 233 U.S. 389; 58 L.Ed. 1011.
The banking business is charged with the public interest and it is subject to regulation under the police power of the state; consequently, the rights of all persons having a direct contact with that business may be altered and changed in a reasonable manner. Munn v. Illinois, 94 U.S. 113, 132; 24 L.Ed. 77;Manigault v. Springs, supra; Block v. Hirsh, 256 U.S. 135;65 L.Ed. 865; Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242;66 L.Ed. 595. *Page 154 
Since the banking business is in its nature public, the rights of all connected therewith are therefore subject to regulation by the legislature, and the legislature by that regulation may reasonably affect the obligations of contracts and the remedies for their enforcement. The creation and control of corporations under our constitution is given to the legislature by article 4, section 7, paragraph 11, constitution of New Jersey, which reads as follows:
"The Legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, in its judgment, may be provided for by general laws. The Legislature shall pass no special act conferring corporate powers, but they shall pass general laws under which corporations may be organized and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration, at the will of the Legislature."
The passage of a general law providing for the incorporation of corporations for certain specific purposes shows a clear legislative intent to separate such corporations from those which may be incorporated under the General Incorporation act of 1896.Richards v. Dover, 61 N.J. Law 400; Domestic Telegraph andTelephone Co. v. Newark, 49 N.J. Law 344; Montclair MilitaryAcademy v. State Board of Assessors, c., 65 N.J. Law 516;State v. Atlantic City, c., Railroad Co., 77 N.J. Law 465;McCarter, Attorney-General, v. Imperial Trustee Co.,72 N.J. Law 42. The trust companies of the state are created under statutes which derive their support from this last cited provision of the constitution, and chapter 116 of the laws of 1933, and chapter 221 of the laws of 1935, may be here sustained on the theory of reserved police power, or special power expressly reserved.
In Noble State Bank v. Haskell, supra, Mr. Justice Holmes, delivering the opinion of the court, said (55 L.Ed. — at p.116):
"Among matters of that sort probably few would doubt that both usage and preponderant opinion give their sanction to enforcing the primary conditions of successful commerce. One of those conditions at the present time is the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business. If, *Page 155 
then, the legislature of the state thinks that the public welfare requires the measure under consideration, analogy and principle are in favor of the power to enact it."
He further said:
"We cannot say that the public interest to which we have adverted and others, are not sufficient to warrant the state in taking the whole business of banking under its control. On the contrary, we are of opinion that it may go on from regulation to prohibition except upon such conditions as it may prescribe. * * *"
The legislation attacked in the above case not only affected stockholders of the banking institutions involved but likewise their depositors.
In Craughwell v. Mousan River Trust Co., 113 Me. 531;95 Atl. Rep. 221 (1915), the court said (at p. 222):
"Banking is necessarily a delicate business. To be successful it must retain public confidence. * * * If a bank were a private institution, and the consequences which we have referred to were to visit only those who have chosen to associate together as stockholders, those consequences would be lamentable, but endurable. But a bank is not merely a private institution. It is in a very important sense a public institution, in that the public are deeply concerned in its well being. Its welfare affects not only its stockholders, but also its depositors. And besides stockholders and depositors, the business public itself is concerned. The general well being of the public is affected by the success or downfall of the banks, which feed the arteries of business."
In Abie State Bank v. Bryan, 282 U.S. 765; 75 L.Ed. 690
(1931), the supreme court of the United States, in sustaining an amendment to a Bank Guaranty law which imposed special assessments upon local banks in favor of closed banks, said (75 L.Ed. 707):
"We see no reason to doubt the power of the legislature to extricate the banks and the administration of the guaranty fund from the serious plight in which they were found under the operation of the old plan and to exercise a reasonable discretion in seeking this result."
In Barrett v. Bloomfield Savings Institution (1903), 64 *Page 156 N.J. Eq. 425; affirmed, 66 N.J. Eq. 431, Vice-Chancellor Pitney said (at p. 428):
"I have said that the question is of great importance, not so much to the parties to this cause as to the public at large, and especially to those citizens who believe that the savings bank system of this state and, indeed, of most of the other states of the union, is of great value to the public at large. * * *"
In Campbell, Rec'r, v. Watson, 62 N.J. Eq. 396,
Vice-Chancellor Pitney referred to banks as quasi-public institutions.
In Hourigan v. North Bergen Township, supra, Mr. Justice Heher, speaking for the court of errors and appeals, among other things, said:
"The proper exercise of the police power is the highest duty of government. The state may, in some cases, forego the right of taxation, but it can never relieve itself of the duty of providing for the safety of its citizens. This duty, and consequent power, override all statute or contract exemptions. The state cannot free any person or corporation from subjection to this power. All personal as well as property rights must be held subject to the police power of the state. Boston, c.,Railroad Co. v. York County, 79 Me. 386."
In Milner v. Gibson (1935), 249 Ky. 594; 61 S.W. Rep.
2d 273, the statute was essentially like that involved here — it provided for a court approval of the plan. The court said (61 S.W. Rep. 2d — at p. 278):
"Banks and banking are proper subjects of legislative control and strictly within the internal police power of the state.Thompson on Corporations (1st ed.) § 640; Blaker v. Hood,53 Kan. 499; 36 P. 1115; 24 L.R.A. 854; American SouthernNational Bank v. Smith, 170 Ky. 512; 186 S.W. Rep. 482; Ann.Cas. 1918B 959. They are subject to such regulations as the state may lawfully impose in the exercise of its police power to protect the welfare of the public (Holden v. Hardy,169 U.S. 366; 18 S.Ct. 383; 42 L.Ed. 780), where there are feasible reasons of public policy for them. Minnesota Iron Co. v.Kline, 199 U.S. 593; 26 S.Ct. 159; 50 L.Ed. 322. The state is not required to pay tribute to *Page 157 
them or their or other private contracts at the expense of the public welfare. It is only arbitrary restraint and impairment of contracts (article 1, section 10), not immunity from reasonable regulations to safeguard the public interests, that the federal constitution prohibits. Miller v. Wilson, 236 U.S. 373;35 S.Ct. 342; 59 L.Ed. 628; L.R.A. 1915F, 829. Contracts being subject to legislation enacted in the exercise of the police power, it is not invalid merely because of its incidental effect upon them. St. Louis Poster Advertising Co. v. St. Louis,249 U.S. 269; 39 S.Ct. 274; 63 L.Ed. 599. They must yield to the public welfare when the latter is appropriately declared and defined, and the two conflict. Union Dry Goods Co. v. GeorgiaPublic Service Corp., 248 U.S. 372; 39 S.Ct. 117; 63 L.Ed. 302;9 A.L.R. 1420. Where made by parties, either of whom is subject to statutory regulations, they must of necessity be subject to the exercise of the sovereign power of the government to enact legislation for the protection of the general welfare. Rast v.Van Deman L. Co., 240 U.S. 342; 36 S.Ct. 370; 60 L.Ed. 679;L.R.A. 1917 A. 421; Ann. Cas. 1917B 455. When the public welfare demands the exercise of the sovereign right of the government for its protection, and private contracts intervene, they must yield to the right of the sovereign to exercise the police power.Manigault v. Springs, 199 U.S. 473; 26 S.Ct. 127;50 L.Ed. 274; Stone v. Mississippi, 101 U.S. 814; 25 L.Ed. 1079."
The statute in the last mentioned case expressly provided that the dissenting depositors might have their claims liquidated by payment in money or in kind out of the assets of the closed institution; in the instant case, that is precisely what the plan of reorganization accomplishes for the parties in interest. The depositors receive forty per cent. of the deposits in cash and sixty per cent. thereof in preferred stock "B" of the reopened bank; while the certificate holders are given new certificates in exchange for the ones they hold, and an interest in a definite reserve. In Doty v. Love, 295 U.S. 64; 55 S.Ct. 558;79 L.Ed. 632; 96 A.L.R. 1438, the supreme court of the United States had before it for review the Mississippi case reported sub nom.Dunn v. Love *Page 158 
in 155 So. Rep. 331; 92 A.L.R. 1323. The statute in that case expressly provided for an approval of the plan of reorganization by the chancellor. The supreme court of the United States affirmed the action of the Mississippi supreme court, and in sustaining the statute, Mr. Justice Cardozo, speaking for the court, said (79 L.Ed. — at p. 635):
"If we look to the surface of the statute and no farther, there is not even colorable basis for the argument that the constitution is infringed. All that the statute does upon its face is to change the method of liquidation. The assets of the business are to be devoted without impairment or diversion to the payment of the debts. As to this the statute is explicit. Act of 1932, chapter 251, section 3. In the discretion of the court of chancery a reopened bank is to take the place of the state superintendent for the purpose of gathering in the assets and discharging liabilities. The substitution may not be made unless the court is satisfied that the reopened bank is solvent and able to satisfy the debts to be assumed. Payment of the creditors is still the end to be attained, and resumption of business a means and nothing more. If debts are thereby swollen or assets made to shrink, the outcome is an unlooked for incident of a method of administration conceived to be more efficient than present sale and distribution. The constitution of the United States does not confer upon the depositors a vested right to liquidation at the hands of a state official. Gibbes v. Zimmerman, 290 U.S. 326,332; 78 L.Ed. 342, 347; 54 S.Ct. 140.
"The argument will not hold that the necessary operation of the statute is to subject dissenting creditors, who may be as many as one-fourth, to the will or the whim of the assenting three-fourths. The creditors favoring reorganization, though they be ninety-nine per cent., have no power under the statute to impose their will on a minority. They may advise and recommend but they are powerless to coerce. Their recommendation will be ineffective unless approved by the superintendent. Even if approved by him, it will be ineffective unless the court after a hearing shall find it wise and just. Upon such a hearing every objection to the plan in point of law or policy may be submitted and considered. The *Page 159 
decree when made by the chancellor will represent his own unfettered judgment. The judicial power has not been delegated to non-judicial agencies or to persons or factions interested in the event. Like statutes have been upheld by the courts of other states. * * *
"The act of 1932 being valid on the surface, the question remains whether it has been so applied or interpreted in the adoption of this plan as to bring out defects that were lurking underneath * * *.
"The argument is made that some of the assets of the old bank are placed at the risk of the business of the new one. All this was done for the protection of existing creditors. The finding is that collections are made more promptly and readily by a going concern than by one in liquidation. Cf. Christensen v.Merchant and Marine Bank of Passagoula. 168 Miss. 43, 57. For illustration, a live bank is much more efficient than a closed one in selling parcels of real estate or in carrying them while unsold at profitable rentals. Adequate precautions are embodied in the plan to assure the enjoyment of these benefits by the creditors and not by others.
"The argument is made that a cause of action upon contract has been destroyed or given away to the prejudice of depositors in that shareholders have been released from their personal liability in return for a contribution of capital to the regenerated business. This is said to constitute a denial of due process or an impairment of contract within the doctrine ofEttor v. Tacoma * * *. The answer is much the same as to the argument last considered. The effect of the release has been to make it possible for the bank to be reopened with the result to the creditors of economies and other benefits that would otherwise be lost. During about two years and a half of liquidation there had been collected from the whole body of the shareholders, representing two thousand shares, a small percentage only of the total liability. The superintendent expressed the belief that it might be possible in the course of many years and with great expense and labor to bring collections from these sources to a total of $75,000. Through the method called for by the plan, capital in the sum of $55,000 became available at once as additional *Page 160 
security for the obligations assumed by the reorganized business. This capital was supplied by the holders of one thousand one hundred shares, whose maximum liability was $110,000. The liability of the other shareholders ($90,000 at the maximum) continued unimpaired for whatever it was worth. The chancellor found from the evidence that in all probability the moneys thus obtained as contributions to capital could not have been collected by judgment and execution, and that the depositors would be the gainers by the substituted form of payment. He reached that conclusion after a trial in the county of the vicinage with his finger on the pulse of neighborhood conditions. On appeal to the supreme court his findings were confirmed. Cf.Smith v. Texley, supra (In re Farmers' Exchange Bank, 55 S.D. 195; 225 N.W. Rep. 307).
"In such circumstances it is idle to speak of the release of liability as a gift or a sacrifice of valuable assets. The release was none of that, but a compromise of a liability of uncertain value upon terms beneficial to the creditors."
The claim was also made in the Doty Case that the plan was unfair in that it deprived dissenting depositors of their rights because it contemplated the payment of small accounts in full. The court (at p. 637) said:
"The appellants also say that their constitutional rights were infringed by those provisions of the plan whereby a preference was granted to the holders of small claims. None of these claims ($3,649.87 in the aggregate) was for more than $5, and many, we were informed upon the argument, were for only a few cents. The chancellor found by his decree that it would be more economical to pay these accounts in full than to incur the bookkeeping expenses incidental to a calculation of percentages whenever dividends were paid to others. Cf. Nagel v. Ghinger, supra
(166 Md. 231; 171 Atl. Rep. 65; 92 A.L.R. 1315.) The objecting creditors have not been damaged by that feature of the plan."
I do not, under the circumstances, find that the statutes under which the plan of reorganization of the trust company is presented, are in conflict with our state or federal constitutions. I find that the plan is fair and equitable, and I shall approve it as such. *Page 161