Petitioners, various groups of holders of preferred stock of the Trust Company, are before the court on an application that they be declared to be creditors of the Trust Company on an equal footing with depositors and other creditors of the corporation. *Page 233 
The basic facts are as follows:
The Trust Company, along with other banking institutions, had its operations suspended on March 4th, 1933. Under the provisions of the Altman Act, chapter 27, laws of 1933, the Trust Company operated in a restricted manner limited to new deposits only. Steps were taken to reorganize the Trust Company under the provisions of chapter 116, Laws of 1933, and this reorganization was accomplished in accordance with the statute. In substance, the statute provides that where the circumstances warrant, a bank or trust company may be reorganized by the application of a fixed percentage of the deposits to the payment of preferred stock to be issued, the balance to be made available for payment to the depositor. The statute provides that 75% of the depositors must consent to the plan and, upon their doing so, the consent of the balance is not necessary, but they are bound by the terms of the reorganization. In the present instance, the reorganization provided for the issuance to depositors of one share of 6% cumulative preferred stock of the par value of $10 for each $100 of deposit, redeemable at any time by the Trust Company at $30 a share. The redemption price, together with all accumulative unpaid dividends, was to have priority over the former stock of the Trust Company which was itself reduced in par value from $100 to $10 a share. All stock was to have equal voting power.
More than the required 75% consented to the plan which was approved by the State Banking Department and the reorganization was put into effect, the certificate of incorporation being amended so as to embody the terms of the plan. The amended certificate of incorporation provided as follows:
"Fourth: The amount of the capital stock of said corporation is One Million Three Hundred Twenty-five Thousand Dollars divided into one hundred thirty-two thousand five hundred shares of the par value of ten dollars each. Of this amount fifty seven thousand five hundred is preferred stock and seventy five thousand is common stock. The Preferred Stock shall be subject to retirement at thirty dollars per share plus all accumulated dividends unpaid thereon. Each share thereof shall entitle the holder to one vote.
"1. The holders of the preferred stock shall be entitled to receive, when and as declared by the Board of Directors, out of the net profits *Page 234 
of the corporation (after making such transfer to surplus as may be required by statute and after making provision for such reasonable reserves as may be required by the Commissioner of Banking and Insurance) cash dividends at the rate of six per cent per annum of the par value thereof and no more, payable semi-annually on the last day of July and the last day of January in each year accruing from the date of issue thereof, before any sums shall be utilized for the retirement of preferred stock and before any dividends or other distribution whether in cash, property, stock or otherwise shall be declared or paid upon or set apart for or made in respect to the common stock. Dividends on the preferred stock shall be cumulative so that no sums may be utilized for the retirement of preferred stock and no dividends or other distribution whether in cash, property, stock or otherwise may be declared or paid upon or set aside for or made in respect to the common stock until all dividends on shares of the preferred stock accrued to the end of the current semi-annual dividend period shall have been paid or declared and funds set apart for the payment thereof. So long as any shares of preferred stock are outstanding, no dividends on the common stock shall be paid in any one year at a rate in excess of three (3%) per cent of the par value thereof and no dividends whatsoever on the common stock shall be paid except from net profits of the corporation accruing after the date of these amended articles.
2. If the bank is placed in voluntary liquidation or is liquidating under the authority of the Commissioner of Banking and Insurance after said Commissioner has taken possession of the property and business of the bank, or if a receiver is appointed therefor, no payment shall be made to the holders of the common stock until the holders of the preferred stock shall have been paid in full thirty dollars per share plus all accumulated dividends.
"3. The preferred stock may be retired by the corporation at its election as expressed by resolution of its Board of Directors in whole or from time to time in part by lot at any time, by paying therefor, out of the net profits of the corporation accruing after the date of these amended articles, or, with the approval of the Commissioner of Banking and Insurance, out of the proceeds from an issue of common stock after such date, or from paid-in surplus paid in after such date, the sum of Thirty Dollars, per share together with an amount equal to all unpaid dividends thereon, whether or not earned or declared, accrued to the date fixed for the retirement thereof (hereinafter referred to as the `retirement date') the total amount so to be paid being hereinafter referred to as the `retirement price.' At least thirty days written notice of every such retirement shall be mailed to the holders of record of the shares to be retired at their respective addresses, as shown on the books of the corporation stating the retirement date and the retirement price, and the place of payment thereof. On and after the retirement date, each holder of shares of preferred stock so called for retirement shall be entitled to receive payment of the retirement price of such shares (without interest) upon surrender to the corporation at the place designated in such *Page 235 
notice, of the certificate or certificates therefor properly stamped for transfer (if required) and duly endorsed in blank or accompanied by proper instruments of assignment and transfer duly executed in blank. In case less than all of the shares represented by any such certificate are retired, a new certificate shall be issued representing the unretired shares. From and after the retirement date fixed in any such notice unless the corporation upon tender, on or after the retirement date, at the place stated in such notice, of the certificates called for retirement shall fail to pay the retirement price, all dividends on shares of the preferred stock, thereby called for retirement shall cease to accrue, such shares shall be deemed to be no longer outstanding, and all rights of the holders thereof as stock-holders of the corporation, except the right to receive the retirement price, shall terminate. Any and all shares of the preferred stock retired by the corporation as hereinbefore provided shall forthwith be cancelled and shall not be reissued and no preferred stock shall be issued in lieu thereof or in exchange therefor.
"4. So long as any shares of the preferred stock are outstanding, the corporation on each July 31 and January 31, shall apply the net profits of the corporation for the six months period ending the next preceding June 30 or December 31, as the case may be, (after making such transfers to surplus as may be required by statute and after making provisions for such reasonable reserves as may be required by the Commissioner of Banking and Insurance).
"(a) first, to pay dividends upon the preferred stock accrued to the next preceding June 30 or December 31, as the case may be.
"(b) second, to set aside in the retirement fund hereinafter described, fifty per cent of the remainder of such net profits.
"(c) third, to pay dividends which may be declared upon the common stock as permitted in paragraph (1) of this article fourth.
"5. In addition to the method of retiring the preferred stock described above in paragraph three, the Board of Directors may when the balance in the retirement fund in their judgment warrants such action cause notice to be mailed to all holders of record of preferred stock at their respective addresses as shown on the books of the corporation specifying the amount in said retirement fund which the Board purposes to devote to the retirement of such preferred stock and stating that the same is available for the purchase of preferred stock at the lowest price tendered within thirty days after the date of mailing of such notice. At the expiration of such twenty days the corporation shall apply such sum to the purchase of preferred stock if obtainable in accordance with the terms of such notice. Such price shall not be in excess of Thirty ($30) Dollars per share. All shares of preferred stock so purchased shall forthwith be cancelled and shall not be reissued and no preferred stock shall be issued in lieu thereof or in exchange therefor."
The plan of reorganization having been declared to be in operation, certificates of preferred stock were accordingly *Page 236 
made out to all the depositors. The Trust Company resumed unrestricted operation and continued to do so until June, 1939, when it closed its doors in liquidation. Meanwhile, dividends on the preferred stock, aggregating in number eight, were made from time to time and in every instance so far as appears from the hearing herein, checks for the dividends were accepted by all the preferred stockholders.
It is the contention of the petitioners that the preferred stock is such in name only, and that in legal effect, the depositors in the Trust Company at the time when it first suspended operations in 1933 remained creditors of the Trust Company to the extent of 30% of their deposits and as such have a right to participate with all the present depositors in the Trust Company.
This contention is, in my opinion, unsound. The statute under which the Trust Company was reorganized authorized the issuance of preferred stock to stand in the place of a portion of the indebtedness due the depositors, and the stock issued in the present instance was issued in strictest conformity with the statute. It seems clear from the language of the statute and the amended certificate of incorporation that the obligation issued to the preferred stock was in essence a true preferred stock, not a certificate of indebtedness in the nature of a debenture.
It is true that equity considers the substance and not the form, and that if the nature of the transaction between the depositors and the Trust Company was such as to continue them as full creditors except for a postponement of the time of payment, the mere fact that the evidence of the transaction was called preferred stock did not affect their rights. But this rule is not applicable here. An examination of the nature of the transaction and the documents executed demonstrates that it was the intention to subordinate the rights of the preferred stockholders to general creditors. The Trust Company was in such a financial condition that it was unable to resume operations with payment in full to all its creditors. The very purpose of the act was to scale down the amount of the general indebtedness so as to put the company on such a sound financial basis that it could with safety resume operations. *Page 237 
It was, of course, the expectation that a continuance of business under these conditions would, sooner or later, give an opportunity to benefit by an appreciation of assets and a possible realization of other assets then of doubtful value, so that the original depositors would ultimately receive the 30% balance of their deposit. In the outcome, this hope was not realized and the Trust Company again in 1939 was forced to close its doors.
The statute authorizing the reorganization, the amended certificate of incorporation and the certificates issued to petitioners, all referred to the obligations issued to depositors as preferred stock, and there is nothing in any of them to indicate that anything of a different nature was intended. The statute, by section 6, provided that subscriptions to preferred stock should be paid for either in cash or by offset against a deposit balance. The amended certificate of incorporation, by subdivision 2 of paragraph fourth, hereinabove quoted, provided for the nature of the preference to be given the preferred stockholder, namely, that "no payment shall be made to the holders of the common stock until the holders of the preferred stock shall have been paid in full thirty dollars per share plus all accumulated dividends." It seems clear that it was intended that the preference should be only as against common stockholders, and that the preferred stockholders should have no right to share with general creditors.
Even if it be considered, as argued by petitioners, that in substance the certificates are to be considered as debentures issued as evidence of a debt, it seems equally clear from the foregoing reasoning, that in any event, the rights of the holders of the certificates must be postponed to those of general creditors. As heretofore pointed out, it was the very purpose of the statute and the reorganization plan to scale down the debt of the company, so as to enable it to survive and function with safety.
The statute under which the company was reorganized has been held to be constitutional and all the depositors have been held to be bound by the reorganization, even though they did not all assent, provided the plan was approved by the requisite percentage of depositors. In re Mechanics Trust *Page 238 Co., 119 N.J. Eq. 141; McSweeney v. Equitable Trust Co.,16 N.J. Mis. R. 193; affirmed, 127 N.J. Law 299; Newman v. AsburyPark and Ocean Grove Bank, 15 N.J. Mis. R. 395.
It is argued on behalf of the petitioners that a different construction should be given to the preferred stock certificate because of certain statements made on behalf of the Trust Company in order to secure the consent of the depositors to the reorganization plan. Stress is laid upon such statements as that the 30% proposed to be applied to the preferred stock would be safe in a good interest-bearing security, and that this was to be really regarded as a deferred deposit to be temporarily deferred only. In view of the fact that the subscription agreements clearly show the nature of the obligation to be issued to the depositors in the preferred stock, such statement must be interpreted to mean only that a strong hope was extended to the depositor that ultimately they would get back the 30% together with interest thereon at 2% per annum.
An additional reason for denying the present application is on the ground that an estoppel exists against the preferred stockholders. After the 30% was applied on the subscriptions to the preferred stock, and the Trust Company resumed operations, this 30% was deducted from the indebtedness on the books of the Trust Company and applied to the capital structure.
On this basis, new obligations to later and other depositors were undertaken and a contract for insurance of deposits was entered into by the Federal Deposit Insurance Corporation. These operations continued for several years, during which time, as heretofore stated, dividends on the preferred stock were repeatedly paid. The applicable rule is laid down in McSweeney
v. Equitable Trust Co., 127 N.J. Law 299. The Court of Errors and Appeals, speaking by Mr. Justice Donges, says:
"The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge of his rights and of all the material facts, remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition *Page 239 
thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable becomes unimpeachable."
The court cites the cases of Basen v. Clinton Trust Co.,115 N.J. Law 546; New Jersey Suburban Water Co. v. Harrison,122 N.J. Law 189; Rothschild v. Title Guarantee and Trust Co.,204 N.Y. 548; Hayward v. Eliot National Bank, 96 U.S. 611.
In Basen v. Clinton Trust Co., supra, which dealt with the reorganization under the same statute as here involved, the Court of Errors and Appeals says:
"The doctrine of estoppel is peculiarly applicable to the present case. By permitting the plan to be adopted and carried into effect without objection and accepting the benefits of the enlarged fund created by the reorganization, it constituted acquiescence in the plan and its future operation and the plaintiffs should not now be heard to contend to the contrary."
The application made by the defendants for leave to file an amended answer, fully setting forth the defenses to the application, decision upon which was deferred, is now granted.
The application on the petition to allow the holders of certificates of preferred stock to share equally with all other creditors, must be denied. *Page 240