115 N.J. Super. 424 (1971)
280 A.2d 193
WILLIAM M. LAMBERT, PLAINTIFF-RESPONDENT,
v.
FISHERMAN'S DOCK COOPERATIVE, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 5, 1971.
Decided July 9, 1971.
*426 Before Judges SULLIVAN, COLLESTER and LABRECQUE.
Mr. Robert F. Novins argued the cause for appellant (Messrs. Novins & Novins, attorneys).
Mr. Thomas J. Gunning argued the cause for respondent (Messrs. Rogers, Sim, Sinn, Gunning & Serpentelli, attorneys).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendant Fisherman's Dock Cooperative, Inc. (the association) appeals from a judgment in favor of plaintiff for $18,498.86 following a trial before the court without a jury.
Defendant is a fishermen's cooperative organized July 1, 1953 pursuant to N.J.S.A. 34:17-1 et seq. governing cooperative societies of working men. Briefly, its purposes were to provide a ready market for the sale of aquatic products (as defined in 15 U.S.C.A. § 521 (1963)) produced by its members, provide docking and other facilities for members and patrons, and generally to benefit its members through a more efficient and economical method of marketing their produce. Its capital stock was divided into 2,000 shares, each with a par value of $50. Each member could *427 cast but one vote, regardless of his share holdings. The certificate of association provided, in pertinent part:
d. Stock may be acquired by producers of aquatic products; and in exceptional cases by other persons having connection with the fishery trades, but not exceeding 5% of the total membership and after approval by the Board of Directors.
The certificate of association recited that it and the bylaws could be amended, altered or repealed "in any manner not inconsistent with the statutes of New Jersey by the written consent of a majority of the stockholders * * * given at any regular or special meeting of the stockholders."
The bylaws provided that the findings of the board of directors as to the original or continued eligibility of a shareholder were to be final and conclusive, and stock in the association was to be transferred only, with the consent of such board, to those eligible to hold the same. The board was vested with power to cancel permanently the membership of a stockholder for good and sufficient cause upon tender to him of the fair book value of the shares held by him, as determined by the board, together with any other sums due and unpaid and less any amount due the association. In the event of the proposed cancellation of membership or expulsion of a member he was to be informed in writing of the charges against him at least ten days before the meeting at which the board was to pass upon his proposed cancellation or expulsion, at which time he was to be afforded an opportunity to be heard.
Under article II of the bylaws the association's stock certificates were to contain the foregoing restrictions on membership and transfer of stock, and a further provision that:
When the board of directors of the association is of the opinion that the association has sufficient working capital to enable the association to do so, certificates of stock shall be retired at their cost to the holder, in the order in which issued, except that each member shall continue to hold at least two shares of the stock. This association shall have the right to purchase any of its stock at its par or book value, whichever is less, in the event the owner thereof is not engaged *428 in the production of fishery products. This stock is also subject to all the other terms and conditions stated in the articles of incorporation and the by-laws of this association. [Emphasis added]
The articles of association and bylaws were subject to amendment.
Plaintiff William M. Lambert had been in the real estate and insurance business for 22 years. He became a shareholder in the association when he purchased two shares of its stock, allegedly for $125, in 1957.[1] During the next two years he was engaged in commercial fishing and sold his catch through the cooperative. For these years he received patronage dividends (more accurately described as patronage refunds) representing his share of the profit derived from the operations of the association, based upon the dollar amount of fish products which it handled for him during those years.
In 1959 plaintiff gave up the fishing business and began to engage in clamming. At first he sought to sell his clams through the association, but the volume was too great for the latter to handle and it was then agreed that plaintiff would market his catch himself, but would use the association's docking, processing and storage facilities, upon payment of a fee. This fee was originally 15 cents a (bushel) basket of clams; it was later reduced to ten, then to eight cents, then increased to ten. An additional $65 per month was paid as rental for space used for maintenance and storage. Besides this plaintiff purchased fuel and supplies for his boats from the association at what was less than the general retail price. This practice continued until plaintiff withdrew from the clamming business and sold his boats sometime in 1964. Thereafter he no longer patronized the association, and in July 1965, after notice, his membership was terminated.
During the period plaintiff engaged in clamming he received no patronage dividends even though the dividends *429 paid to others included profits derived from goods and services bought by him from the association. The court found that between the years 1960 and 1963 defendant had reduced its charges to plaintiff from ten cents to eight cents a basket after pressure by plaintiff to pay him a patronage dividend based on the amount of business he was doing with defendant. It found that a majority of the members had decided upon an informal policy of pooling all income from all sources and dividing it only among those members who sold their fish through the association.
The original bylaws in effect when plaintiff became a member provided, as noted, that a shareholder upon the termination of his membership for cause by the board of directors, was entitled to the "fair book value * * * as determined by the board of directors" of shares held by him. One such cause was ceasing to patronize the association. An amendment to the bylaws, adopted July 15, 1962, provided that upon such termination a shareholder was to receive the price paid for his stock. At the same time the clause authorizing repurchase of his stock at par or book value (whichever was less) when a shareholder ceased to be engaged in fishing was amended to the same effect.
In 1965, after plaintiff had sold his boats and ceased all maritime operations, he received ten days notice of a meeting to consider the proposed cancellation of his membership because (1) he was a nonproducer and (2) for cause as outlined in the bylaws. The letter recited that he would be tendered the "fair book value" of his shares upon termination. Plaintiff answered that he would agree to give up his membership "provided the fair book value of the stock shares is determined fairly." The court below found that in all probability the tender of "fair book value" was a clerical error not authorized by the board of directors. At the subsequent meeting  which plaintiff did not attend  the board terminated his membership. It later tendered him a check purporting to represent the amount due him less charges currently owing for goods and services. Plaintiff rejected *430 the check and thereafter instituted the present suit to recover the fair book value of his shares plus the amount of patronage dividends claimed to be due covering the period from 1961 to the date of termination.
Briefly stated, plaintiff's theory of recovery was that when he purchased his two shares of the association's stock he was purchasing a "growth" stock; since the net worth of the association increased substantially in value thereafter, his interest had increased in proportion; thus he should be paid an amount equal to the net worth of the association, regardless of its liquidity. He argued that by changing the bylaws the association destroyed the "growth potential" of his shares, and thus breached its contract with him as a shareholder.
The court below appears to have accepted plaintiff's theory as to the nature of his relationship with the association. It held that the provision in the bylaws fixing the amount to be paid an expelled member for his stock constituted a contract between plaintiff and defendant and vested in plaintiff certain rights which could not be altered without his assent, even though all of the other shareholders, acting in concert, agreed. He ruled that it made no difference whether the corporation was one formed under Title 34 of the Revised Statutes or one formed under Title 14; that the association's stock bore all of the essential characteristics of stock issued by corporations formed primarily for profit. We find ourselves in disagreement.
A cooperative association is a unique institution, differing in many of its essentials from a corporation organized for profit. The relationship between such an association and one of its members is in many respects the antithesis of that which exists between a corporation organized under the General Corporation Act and its stockholders. The latter exists for the purpose of making a profit for its stockholders and its activities are geared to the accomplishment of that end. The amount of dividends paid each stockholder, as well as the number of votes he may cast, depend upon the number of *431 shares held by him. One may be a stockholder though he has never purchased the corporation's product or availed himself of its services  and never intends to. With certain exceptions not here relevant, the stock of such a corporation may be purchased, held and transferred without restriction and without the necessity of corporate approval.
A cooperative association, on the other hand, has been defined as a democratic association of persons organized to furnish themselves an economic service under a plan that eliminates entrepreneur profit and that provides for substantial equality of ownership and control. Packel, The Organization and Operation of Cooperatives (4 ed. 1970), § 2 at 4, 5. See also 18 Am. Jur.2d, Cooperative Associations, § 1 (1965); Patterson, The Tax Exemption of Cooperatives, 13-18 (1958); 16A Fletcher, Cyclopedia Corporations, § 8285 (1962). In general, each shareholder has equal ownership and exercises an equal share in the control of the association, regardless of the number of shares of stock he holds. N.J.S.A. 34:17-10; 15 U.S.C.A. § 521 (1963). By its very nature a cooperative is not designed to make a profit, and the return on capital, if authorized, is limited. 18 Am. Jur.2d, Cooperative Associations, § 2 (1965); 15 U.S.C.A., supra. Usually, such profits as may be realized from the association's activities are proportionately divided among the shareholders on the basis of the amount of their patronage during the period the profit was earned. 18 Am. Jur.2d, Cooperative Associations § 2, § 14 (1965).
A significant characteristic of a cooperative is the right of the association to restrict ownership of its shares to those availing themselves of its services, to restrict the number of shares held by a member and to prohibit or limit transfers of stock. To this end N.J.S.A. 34:17-2 requires that the certificate of association set forth the terms of admission of members, the mode of application of profits and the requirements for alteration or amendment of the certificate of association and the bylaws. See also, N.J.S.A. 34:17-10.
*432 A cooperative may also specify how members may withdraw or otherwise be separated from membership, and the amount to be paid them upon such withdrawal or separation. 18 Am. Jur.2d, Cooperative Associations § 17 (1965). N.J.S.A. 34:17-6 specifically requires that the bylaws provide how members may withdraw from the society and also:
d. Whether the shares, or any number of them, shall be transferable, and if it is determined that they shall be transferable, provision for their transfer and registration, and the consent of the board of directors to the same, and if it is determined that the shares shall not be transferable, provision for paying to members the balance due to them on withdrawal * * *.
From the foregoing it is clear that a cooperative association exists primarily for the purpose of furnishing services for its members. It is intended to continue to function, notwithstanding the withdrawal or expulsion of individual members. Unless and until liquidation takes place, individual members have no present possessory interest in the association's assets and may be required to surrender their shares to the association upon receipt of such consideration as may be fixed by the bylaws. A growth stock would be a rank misnomer for such a security.
With these principles in mind we proceed to consideration of the merits. It appears clear that ample justification existed for the termination of plaintiff's membership and that the procedure laid down in the bylaws was followed in bringing it to an end. The sole questions remaining are (1) the amount to be paid plaintiff upon surrender of his stock, and (2) whether he was entitled to patronage dividends.
Plaintiff contends that upon the cancellation of his stock he was entitled to receive its fair book value as prescribed by the appropriate section of the bylaws in effect at the time the stock was issued to him. Defendant contends that the section of the bylaws which was in effect at the time plaintiff's membership was terminated governs; hence he is entitled to receive no more than the cost of acquisition of his *433 stock. Plaintiff counters that the amended bylaws could not affect his rights under the original bylaws in the absence of his assent to the new bylaws.
We hold that the amended bylaws controlled the redemption of defendant's shares in 1965, and that he thereby became entitled to receive only the price he had paid for his shares. Defendant had no vested right to his proportionate share of the "full book value" of the assets of the cooperative, regardless of how that term might be defined. To permit a member who voluntarily withdraws or who is no longer eligible to membership, to take with him a share of the association's assets based upon his stock holdings, would not only pose the possibility of financial ruin to such an association but would run contrary to the very principles which govern its existence. The termination of plaintiff's membership did not mandate the dissolution or liquidation of the association. Unless the bylaws provided otherwise, its assets were to continue to be devoted to the accomplishment of its purposes. In determining the extent of the "rights" which plaintiff now claims, all of the bylaws bearing on the subject are to be considered.
Plaintiff was chargeable with knowledge that the bylaws authorized the repurchase of his stock if he ceased to be engaged in the fishing industry, as well as his expulsion if he ceased patronizing the association, even though he was still so engaged. His stock certificate contained a provision, as directed by the bylaws, that "this stock is also subject to all the other terms and conditions stated in the articles of incorporation and the bylaws of this association." The latter fixed the amount to be paid a terminated member in exchange for his stock  and provided they could be amended at the will of the membership. The reserved right to amend the bylaws and thus change the amount to be paid for its shares was neither arbitrary nor unreasonable in view of the nature of the association. The amount to be paid a shareholder upon withdrawal could well depend upon a number of variable factors, including the financial condition of the association *434 and its current monetary requirements. Where, as here, the association had shares available for sale to eligible members at $125 a share both prior to and following the amendment of the bylaws, there was nothing incongruous in limiting the recapture value of its shares to the cost of acquisition. Here the trial judge's opinion negates any finding that there was any fraud or overreaching involved in such action.
We are further convinced that plaintiff is estopped from denying the applicability of the amended bylaws to his stock holdings. He was elected a director of the association in 1962 and continued to serve through 1963 and 1964. Approximately one month later the bylaws were amended he participated in a meeting of the board of directors at which it was unanimously voted to buy up the shares of some 16 members of the association, who either were no longer engaged in fishing, or had ceased to patronize the association. All of them had acquired their shares prior to the amendment of the bylaws. For their shares eight of such members received $57 a share, four members $50 a share, and one member received $81 per share. Still later, at the director's meeting of March 31, 1963, plaintiff himself made the motion to buy back the two shares of a deceased member from his widow at $125 per share. In participating during his directorship in buying up the stock of other shareholders for the cost of their acquisition, he enhanced the value on liquidation of his own shares[2] and those of the remaining members, while inducing the shareholders whose membership was being terminated to rely upon the applicability of the new bylaws in accepting the reduced price they received. Upon such a state of facts plaintiff was estopped from maintaining that the amendments to the bylaws were not applicable to his shares. See McSweeney v. Equitable Trust Co., 127 N.J.L. 299 (E. & A. 1941), 139 A.L.R. 653 *435 (1942), app. dism. 315 U.S. 785, 62 S.Ct. 805, 86 L.Ed. 1191 (1942); Reilly v. Hamilton Trust Co., 133 N.J. Eq. 232, 238 (Ch. 1943); Montclair Trust Co. v. Russell Co., 135 N.J. Eq. 570, 573 (Ch. 1944). See also 3 Pomeroy, Equity Jurisprudence (5 Ed. 1941), § 802 at 180; Thomas v. Camden Trust Co., 59 N.J. Super. 142, 150 (Law Div. 1959); Stretch v. Watson, 6 N.J. Super. 456, 469-470 (Ch. Div. 1949), mod. 5 N.J. 268 (1950). To hold otherwise would be unconscionable in the extreme.
Wholly aside from the foregoing, we fail to see how plaintiff could have been prejudiced by the application of the amended bylaws. Under one of the original bylaws, and as set out in the stock certificate delivered to plaintiff, the association had the right to purchase any of its shares at par ($50) or book value, whichever was less, in the event the owner thereof was not engaged in the production of fishery products. This bylaw was one of those amended in July 1962. If the words "fishery products" be construed to mean aquatic products, as plaintiff contends, it would appear clear that the association would have had the right to purchase plaintiff's stock at its par value ($50) had the bylaws not been amended.
While by reason of the foregoing it becomes unnecessary to construe the words "fair book value" as used in the original bylaws, we note from the testimony of defendant's accountant that fair book value was construed from the very beginning of the association's existence as the net value of the association's capital assets as taken from its books of account, as distinguished from their market value, after the deduction of liabilities. In line with this definition the book value of shares appears to have been determined more or less regularly by the accountant by dividing the total number of shares of capital stock outstanding into the capital structure as set up in his annual report. The application of this formula would have resulted in a value of not more than $455 per share for plaintiff's two shares, as contrasted with the $7,775 per share claimed by him. In addition, the price *436 at which its stock was available for sale to eligible buyers, and at which stock was to be redeemed, was fixed from time to time by the association. The price thus fixed appears to have been uniformly utilized in paying off shareholders whose memberships were terminated or shares redeemed prior to the 1962 amendment to the bylaws.
Section 2(2) of article X of the bylaws provides that the balance of the net earnings, or savings of the association, after allowing for cash dividends and sinking fund, was to be distributed to "members" on a "patronage basis," in proportion to the "amount of business" each contributed to the association during the year. During the period between 1957 and 1959, while plaintiff was engaged in fishing, he received such patronage dividends. In 1959, when he began clamming, the payment of patronage dividends to him was discontinued. He contends, and we agree, that he continued to be entitled to such dividends notwithstanding that he was thereafter engaged in clamming rather than fishing. He was a member in good standing of the association. It was incorporated for the purpose of "doing business as a cooperative association in all things relating directly or indirectly to the catching, processing, storage, transportation, marketing and distribution of fish and other aquatic products for its members and patrons, and the buying and selling of fishery equipment and other general supplies required by its members and patrons in their business of commercial fishing; to provide and maintain a market site wherein the products of its members and patrons may be offered for sale; [and] to supply docking and other facilities for the benefit of its members and patrons" (emphasis added) and had but one type of membership. The bylaws adopted the definition of aquatic products contained in the Act of Congress, approved June 25, 1934, entitled "An act authorizing associations of producers of aquatic products," 15 U.S.C.A. § 521 (1963), to the effect that the term included all commercial products of aquatic life in both fresh and salt water. Thus, whether plaintiff was engaged in fishing or clamming, *437 as a member in good standing he was entitled to be treated on the same basis as other members.
It is suggested that the distribution of patronage dividends was a matter committed to the discretion of the board of directors, and that they properly excluded plaintiff from participation because he was no longer marketing his products through the association. Not so. The directors could not exclude a member in good standing from participation in such dividends as were declared by the association unless authorized to do so by the bylaws. We need not pass on the question of whether the association could lawfully restrict the payment of patronage dividends to those of its members actually engaged in fishing. The fact is that it never officially did so. We find no action by the board of directors excluding plaintiff and others similarly situated from participating in such disbursements, and no provision in the bylaws authorizing such exclusion. Further, the evidence is plenary that plaintiff attempted to market his clams through the association but it declined to handle them after the first week. He nevertheless paid the association a fee for each bushel of clams unloaded, purchased all of his gas, oil and other supplies there, and, in addition, rented space there for use of his business. The income from his patronage appears to have been substantial. We hold he was entitled to share in patronage dividends on the basis of the business done by him. We find the sum due as arrived at by the trial judge, $3,406.76, to be supported by substantial evidence.
The question remains whether the reduction in the fee for docking privileges which was granted plaintiff dispensed with defendant's obligation to pay him patronage dividends. There was testimony that the fee was reduced from ten cents to eight cents a bushel from April 23, 1960 to April 7, 1963. It was contended by defendant, and denied by plaintiff, that this reduction in fees was adopted in lieu of dividends.
The trial judge found, and we agree, that between the years 1960 and 1963 defendant reduced its charges to plaintiff from ten cents to eight cents a bushel after pressure by *438 plaintiff to pay him a patronage dividend, and that the association's secretary testified that it was in lieu of such a dividend. There was uncontradicted testimony that plaintiff benefited to the extent of $8,657.66 from the reduction.
The trial judge made no finding as to whether the reduction was intended to be in lieu of patronage dividends. We are satisfied and find that it was, and that defendant as a member, and later as a director, was chargeable with knowledge that it was so intended. In this manner defendant's informal policy of paying patronage dividends only to those who sold their fish through the association was maintained, while giving due consideration to the business derived from plaintiff. Plaintiff could have rejected the reduction and demanded his due, but elected to do otherwise. It would be grossly inequitable to permit him both to retain the benefits he received during the three-year period mentioned, and recover the amount to which he would otherwise have been entitled during that period. He may not now "have his cake and eat it too." Cf. Knight v. Electric Household Utilities Corp., 133 N.J. Eq. 87, 90-91 (Ch. 1943), aff'd 134 N.J. Eq. 542 (E. & A. 1944). However, upon the termination of the two cent discount and for the remaining time he did business with the association, he would have been entitled to receive patronage dividends. We calculate the amount due, based upon the trial judge's findings, as follows:

 1963 (2/3 year) $ 786.08
 1964 1,424.08
 1965 98.88
 _________
 $2,309.04

Plaintiff is accordingly entitled to judgment against defendant on the first count for the sum of $2,309.04, and to judgment on the second count for the cost of acquisition of his stock. We are in accord with the trial judge that no interest should be allowed.
*439 Reversed and remanded for further proceedings in accordance with this opinion. No costs.
NOTES
[1] Defendant offered proof that the price paid was $57 a share.
[2] Since the association had 272 shares outstanding in June 1962 and their number had been reduced to 66 by June 30, 1965, plaintiff's share of the outstanding stock was quadrupled over that period.